The DOW CHEMICAL
COMPANY, Plaintiff,

v.

HALLIBURTON COMPANY, Defendant.

The DOW CHEMICAL
COMPANY, Plaintiff,

v.

MISSISSIPPI POWER & LIGHT
COMPANY, Defendant.

Civ. A. Nos. GC 78–31–WK–P, GC
78–32–WK–P.

United States District Court,
N.D. Mississippi,
Greenville Division.

June 7, 1985.

Debernd W. Sandt, Bruce M. Kanuch, The Dow Chemical Co., Midland, Mich., Neal A. Waldrop, Troy, Mich., Hainon A. Miller, Greenville, Miss., for plaintiff.

James E. Cockfield, Lahive & Cockfield, Boston, Mass., Thomas R. Weaver, Halliburton Services, Duncan, Okl., for defendant.

## MEMORANDUM OPINION

KEADY, District Judge.

In these consolidated cases, the Dow Chemical Company sues Halliburton Com-

pany and Mississippi Power & Light Company for patent infringement. Both defendants deny infringement, asserting that the patents in suit are invalid and unenforceable and they seek a declaratory judgment of noninfringement, invalidity, and unenforceability as to each patent, together with an award of attorney's fees. After lengthy discovery and submission of a pretrial order, the court severed the issues of liability and reserved the question of damages. Following an evidentiary hearing, the court referred the transcript of testimony and exhibits to the United States Magistrate for preliminary review and recommendations. Upon receipt of the Report and Recommendations, both sides filed written objections. Upon careful review of the evidence and the objections taken to the magistrate's report, the court makes findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a) as follows.

## FINDINGS OF FACT

### I. THE PARTIES

Plaintiff, The Dow Chemical Company (Dow), is a Delaware corporation having its principal office and place of business in Midland, Michigan.

Defendant, Halliburton Company (Halliburton), is a Delaware corporation, duly authorized to do business in Mississippi and having a place of business at Amory, Monroe County, Mississippi.

Defendant, Mississippi Power & Light Company (MP & L), is a Mississippi corporation, duly authorized to do business in Mississippi and having a place of business at Greenville, Washington County, Mississippi, within the Northern District of Mississippi.

Both Dow and Halliburton are regularly engaged in the business of industrial cleaning, among other things.

Mississippi Power & Light Company is an electric power utility corporation regularly engaged in the business of generation, transmission, and distribution of electric power.

### II. THE PATENTS AT ISSUE

Dow is the owner of each of the patents in suit, i.e., the Lesinski patent, U.S. Patent 3,308,065 (Lesinski '065 patent), and U.S. Reissue Patent 30,796, the Teumac patent, U.S. Patent 3,413,160 (Teumac '160 patent), and the Harriman et al patent, U.S. Patent 3,438,811 and U.S. Reissue Patent 30,714 (Harriman '811 patent).

The Lesinski patent was issued to Dow on March 7, 1967. It was returned to the Patent and Trademark Office and replaced by Reissue Patent 30,796 on November 7, 1981. The application for reissue was filed September 14, 1978.

The Harriman patent was issued to Dow on April 15, 1969. It was returned to the Patent and Trademark Office and replaced by Reissue Patent 30,714 on August 18, 1981. The application for reissue was filed September 14, 1978.

The Teumac patent was issued to Dow on November 26, 1968.

### III. CLAIMS

In GC 78–31–K–P, Dow charges infringement by Halliburton of claim 6 of the original and reissue Lesinski patent, infringement of claim 6 of the Harriman patent, now claim 10 of the Harriman reissue, and infringement of claims 4 and 10 of the Teumac patent, and further alleges that infringement by Halliburton has been willful and deliberate. In GC 78–32–K–P, Dow charges MP & L with infringement of the above-stated claims of two of these patents, i.e., Lesinski and Harriman.

### IV. UTILITY BOILER TUBE SCALE BUILDUP AND REMOVAL, AND THE PROCESSES IN ISSUE AND THEIR GENERAL BACKGROUND

A. Steam Boiler Construction, and Tube Scale Formation and Its Effect on Power Generation

A utility power station's steam generating equipment makes steam in large boilers at high pressure to continuously drive turbines which generate electricity. Water

circulates through hundreds of vertically extending small diameter steel tubes which form the shell of a large fire box, typically 40 to 50 feet wide and up to 90 feet deep. The tubes rise vertically up to 200 feet to a steam drum 3 to 5 feet in diameter and up to 90 feet long. With continuous use, the tubes develop internal wall scale, which is mostly iron oxide consisting of magnetite, $Fe_3O_4$, and hematite, $Fe_2O_3$, but which may contain some copper and water hardness deposits, such as calcium or magnesium compounds. These scales undesirably insulate the fire box heat from water inside the tubes. When the scale becomes sufficiently thick, tubes overheat, and will ultimately rupture, due to localized scale buildup and high internal pressure, typically 2,700 lbs. per square inch. A single tube rupture will cause shutdown of the entire boiler for time-consuming mechanical repair. The loss to a utility from boiler shutdown is about $60,000 per day per 100 megawatts of generating capacity. With typical commercial utility boilers of 300 to 1,300 megawatt capacity, the loss can range from $200,000 to $800,000 per day.

### B. Scale Removal Methods Prior to the Process In Issue

Utility companies for many years have employed preventive maintenance to remove boiler scale buildup. Prior to World War Ii, cleaning was done mechanically by drilling scale out of the tubes. This procedure required such a long downtime that chemical cleaning was developed as a replacement.

Dow introduced the first utility boiler tube chemical cleaning method in 1939. This process employed a hydrochloric acid (HCL) solution to dissolve iron oxide scale. For boilers having copper content in the scale, Dow developed and used an ammonium bromate solution to dissolve copper in a second step separate from the iron oxide-dissolving step. These processes were used in the utility industry in this country from the early 1940's through the mid-1950's.

In the 1950's, citric acid was used for cleaning "once-through" boilers with light oxide scale deposits, and at the same time sodium nitrite was introduced for passivating iron surfaces, or rendering the surfaces rust resistant. Problems developed with citric acid precipitates in boilers containing heavy iron oxide scale deposits, and in the late 1950's, cleaning mixtures of citric acid and formic acid were used. In 1961, Dow offered a mixed formic acid-hydroxyacetic acid solution, called the L23 Process.

In the late 1950's, Dow modified its HCL process by adding a copper complexer to enable removal of iron oxide and copper with a single solution. This process became the volume workhorse of the utility boiler chemical cleaning industry. Cleaning solutions consisting of sodium etheylenediamine tetraacetic acid (EDTA) and added chemical reducing agents also were used during this time.

In 1961, Pfizer Corporation introduced a citric acid (CA) solution for dissolving both iron oxide and copper which employed an acid solution of ammoniated citric acid to dissolve iron oxide scale, and a sequential step using an alkaline ammoniated citric acid solution for copper removal; this was called the Citrosolv Process. This process employed an ammoniated chelate as a means of minimizing precipitation of iron compounds or alkaline pH.

### C. Dow's Vertan 675 ACR Process

Using the teachings of the Lesinski patent, Dow developed the first aqueous alkaline solution of a single active constituent, ammonium EDTA, to dissolve iron oxide scale from a metal surface, and introduced that process to the utility industry in the United States in late 1961. Dow designated the process "Vertan 675 Process." In 1964, Dow modified its Vertan 675 Process to incorporate the teachings of the Harriman patent to enable removal of copper immediately following the completion of the iron oxide removal stage by oxidizing the single fill of the alkaline ammonium EDTA solution to dissolve copper. Dow

designated this process the "Vertan 675 Alkaline Copper Removal (ACR) Process."

Dow's Vertan 675 Process for dissolving iron oxide scale in broad terms, consists of preparing an ammoniated EDTA concentrate of about 38%–39% EDTA at a pH between about 8 to 11, usually about 9, injecting that concentrate into the boiler to be cleaned to form a dilute water solution, raising the temperature of the solution to between 250° to 350° F., and circulating the solution through the boiler for a time sufficient to dissolve the iron oxide scale in the boiler. During the cleaning operation, the concentration of the iron EDTA chelate formed by the dissolving solution and the free EDTA is continuously monitored, and an excess of free EDTA is maintained to assure complete dissolution of the iron oxide. Iron oxide removal is deemed complete when successive chemical analyses show no further EDTA chelate formation. As originally practiced, after dissolving the iron oxide the boiler was drained and rinsed, and a passivated, or rust resistant, surface was obtained.

During late 1962 and 1963, Dow's Industrial Service Division successfully removed iron oxide scales from utility boilers in the United States using Vertan 675, and employed these early jobs to develop acceptable commercial embodiments of the '065 Lesinski process.

In 1963, Dow's Nesbitt conducted the first Vertan 675 boiler cleaning job outside the United States on a Sulzer boiler in Holland to remove iron oxide only; this job was successfully completed. In the Holland job, Nesbitt was assisted by Preston Engle, who was then a Dow employee in the Technical Department in Tulsa. After returning to Dow in the summer of 1963, Engle left Dow and was hired by Halliburton in the early fall of 1963.

In Dow's Vertan 675 ACR Process, the iron oxide removal steps are the same as in the Vertan 675 Process. In order to remove copper, the temperature of the ammoniated EDTA solution containing both the ferrous EDTA chelate and free EDTA is lowered to the range of about 180°, instead of draining the solution, and air is sparged into the boiler. While air blow continues, copper analyses and oxidation potential measurements of repetitive samples of the solution are made to determine when all of the copper has been dissolved. The air blow is discontinued when both types of measurements indicate copper removal is complete.

D. Vertan 675 ACR Process Compared to Other Chemical Cleaning Processes

Dow's 675 ACR Process removes both iron oxide and copper with one unit fill of the alkaline ammonium EDTA solution. This feature saves several unit volumes of water, saves chemicals and saves time over conventional acid cleaning methods such as HCL and CA. In the Citrosolv process, iron oxide is removed at an acid pH of 3.5; the solution is then adjusted, on the job, to an alkaline pH of about 10 for copper removal.

The Vertan 675 solution allows firing of the boiler to control temperature, whereas HCL solutions must be heated to a narrow usable temperature outside the boiler before injection; this results in an important saving in downtime when using Vertan 675 instead of HCL. The alkaline Vertan 675 solution is less corrosive, and safer and easier to handle than HCL solutions. After a cleaning job is completed, Vertan 675 solution is easily disposed of by burning, whereas HCL solutions require expensive preparation prior to disposal to avoid pollution.

Even though Vertan 675 chemicals cost more than HCL and Citrosolv chemicals, overall savings result from less downtime, no need for extra piping for handling and pumping heated acid solution, and fewer required specialized technicians.

After commercial introduction in 1963, Dow's Vertan 675 Process for removing iron oxide received slow acceptance by the domestic utility industry in competition with the acid cleaning solutions then available. After 1964, when Dow added the

alkaline copper removal process of the Harriman patent to enable the sequential removal of iron oxide and copper with a single unit fill of solvent, trade acceptance began to grow. By 1979, the Vertan 675 ACR Process had become the major process in use in the cleaning of utility boilers in the United States.

E. Acquiescence by Halliburton in Validity of the Claims in Issue From 1969 to 1977

Preston Engle co-authored a paper with Lesinski and Blake in October 1962 which described the Lesinski invention in general terms. The paper did not identify the ammoniated aqueous pH 9 solution; all that it mentioned was alkaline EDTA chelants, and that iron oxide could be dissolved from boilers in a closed system at pH 9 with "a formulated solution of EDTA (Vertan 675)."

Engle learned about the Lesinski discovery in 1961 from Lesinski, and performed additional development work for Dow in the process; he provided the data set forth in the '065 patent as Examples 4, 5 and 6. Engle had knowledge of the first actual boiler cleaning job using the '065 process in Dow's Midland boiler in July and August 1961, and thereafter was involved in development of the Vertan 675 process. He represented the process to Dow customers as a "breakthrough in the science of chemical cleaning," and so regarded it himself.

Until about the spring of 1963, Engle actively conducted or directed Dow research on the use of inhibitors for the Vertan 675 process and on the problem of copper deposits. Additionally, Engle also prepared releases to the trade on the use of ammoniated EDTA.

In the fall of 1963, after obtaining field experience in the United States and in Holland in boiler cleaning with Vertan 675, Engle left Dow and joined Halliburton.

At Halliburton, Engle became Technical Advisor of Halliburton's Industrial Cleaning Services, and in that position initiated Halliburton's interest in Vertan 675. Prior to that time, Halliburton had done no work with ammoniated EDTA. By the fall of 1964, Engle called on Dow Vertan 675 customers on behalf of Halliburton, and in July 1965 complained to Kellogg Company about specification of Vertan 675 in their cleaning jobs.

The first ammoniated EDTA job which Halliburton conducted was cleaning No. 5 boiler at Kaiser Aluminum's Baton Rouge Plant on August 22 and 23, 1966, approximately seven months before the '065 patent issued. Engle was the technical advisor on that job. After successful completion of the boiler cleaning, Engle wrote the final report setting forth the details of how that job was performed.

After completion of the Kaiser job, Halliburton received a request from M.W. Kellogg Co. for a bid on a boiler cleaning job which specified use of ammonium EDTA. After review of the specifications for the Kellogg job, which referred to Vertan 675, Engle forwarded them in September 1966 to Paul Leonard of the Halliburton Patent Department, and requested Leonard to determine if Dow had a patent on the described material and process.

Halliburton's attorney Leonard advised that it was unlikely that a patent could issue to Dow on the broad idea of cleaning metal with an ammoniated EDTA process. Halliburton's Washington attorney Grove, however, cautioned that a patent on ammonium EDTA for cleaning metal surfaces could possibly be obtained "if it was a fact that ammonium EDTA performed in an unexpectedly superior manner to the sodium salts of EDTA." At trial, Engle admitted that ammonium EDTA by itself is unexpectedly superior to sodium EDTA by itself for dissolving iron oxide.

On October 10, 1966, Leonard advised Engle that it was safe to proceed with Halliburton's plan to use ammoniated EDTA solvent to clean boilers because Dow had no patent on the "Kellogg" process, and "should a patent issue, we can then study its validity."

Engle taught Halliburton personnel how to use ammoniated EDTA, how to mix components to make EDTA, how to maintain a slight excess to produce passivation, and advised Halliburton personnel that they should operate "that cleaning solution at a pH of about 9.9 to 9.5."

After Dow's '065 patent issued in March 1967, Ledlie of Dow's Patent Department called Halliburton's attention to the issuance of the patent in a letter dated April 3, 1967, receipt of which was acknowledged by Halliburton on April 5, 1967.

Engle was advised of issuance of the Lesinski patent and the April 3, 1967, letter from Dow. On May 3, 1967, he advised his superior, Harris, that:

> The references cited by the Patent Office against the subject patent have been reviewed. I have also reviewed my personal records. I could not find anything which could be used to defend our right to continue use by this compound.
>
> In view of the notice issued us by Dow, it is my opinion that we should not further endanger our position by continuing to use the material. If you concur in this opinion, and if it is the expressed desire of management, I will advise our field people accordingly.

On November 30, 1967, Halliburton further responded to Dow's notice of April 3, 1967, stating that Halliburton considered the Lesinski patent invalid in view of a Bersworth Patent 3,033,214.

By March 1969, Engle had heard of Dow using air in its Vertan process to remove copper, and inquired from Halliburton's Patent Department if the use of air would avoid infringement of the '065 patent. He was advised that it would not.

On December 1, 1969, Dow's patent attorney Lilly called Halliburton's patent attorney Tregoning and discussed Halliburton's position as to validity of the Lesinski patent, and infringement of the patent by Halliburton.

Halliburton's Tregoning promptly met with Harris, Engle, and Hathorn, Vice-President of Research and Development, to consider overcoming Dow's charge of infringement of the '065 patent by obtaining a license under the patent. Before the meeting, Tregoning had given consideration to the questions of validity and infringement and had seen the invalidity opinion prepared in June 1967. After the meeting, Halliburton decided to discuss a license proposal with Dow.

Tregoning contacted Lilly and proposed a meeting to be held in Tulsa on December 18, 1969, to discuss the question of licensing. The meeting was agreed upon, but Tregoning cancelled the meeting upon learning that Dow was unwilling to license; he advised Lilly that:

> Our position was simply that if there had been any infringement in the pst, this was a thing of the past, and that we would now look to the present undertaking and determine whether or not infringement did exist. Our purpose was to avoid infringement.

Lilly was satisfied with this arrangement, and was perfectly willing to forget the past since it involved very little.

Between December 10 and December 23, 1969, Engle notified Halliburton Industrial Service Division managers by telephone that they were not to use ammonium EDTA.

During 1970, Halliburton field salesmen maintained the desire to bid on ammoniated EDTA cleaning jobs, but Halliburton management remained firm that Halliburton was not to use the process.

On July 24, 1970, Halliburton's Dillman advised Engle that:

> We are being asked constantly if we can used Ammoniated EDTA for Fe. We are also being asked if we can use Ammoniated EDTA for iron and copper removal (ACR) and if we can't, what are we recommending in its place! I believe the situation is serious and will continue to become more so.
>
> . . . .
>
> [L]et me summarize some of the needs for research if we are going to survive especially in the field of electric utilities:

. . . .

3. We need permission to use or possibly use without permission, the Ammoniated EDTA until we are absolutely prohibited from using it by a Court order. . . .

4. We need, in addition to the above use of Ammoniated EDTA, to get clearance to adapt it to the removal of copper (such as ACR) or a similar variation of the same. If the ACR method cannot be used, then we need to pursue a method equal or better.

Dillman's opinion was that the best process Halliburton had to offer was the HCL process combined with ammoniated citric for neutralizing and removing copper, and that the Citrosolv process was not an acceptable alternative to ammoniated EDTA.

Laboratory Technical Manager Harris responded to Halliburton's Indiana salesmen in August 1970:

As you know a patent exists on the use of this solvent. After we were unsuccessful in negotiating a license using this method, it was decided that other procedures for cleaning would have to be substituted. . . . We did inform all industrial cleaning personnel of the difficulty we might be faced with in the event we ran ammoniated EDTA. However, they were also told not to use the process until further notice. This decision is still in effect.

On August 11, 1971, Tregoning took the position that:

Dow U.S. Patent 3,438,811 certainly provides information which, when added to the coverage Dow has via U.S. 3,308,065 and 3,413,160, does establish a position which we will respect until additional information is forthcoming, i.e., information such as would defeat their position.

In June 1973, Engle assessed the market potential for ammoniated EDTA materials and advised Laboratory Technical Manager Harris:

1. Dow has a patent for the removal of iron oxide and copper.

2. Our only prior use was for the removal of mill scale and some operational deposits, none of which contain copper.

3. The market potential greatly depends on the capability to remove copper as well as iron oxide. Without the capability to remove copper, the market is severely restricted.

. . . .

5. It is rather common knowledge in the industry that Dow has had problems during their promotion of their material.

Engle further advised that the total estimated annual market for ammonium EDTA for pre-operational and operational boiler cleaning amounted to approximately $750,000 for costs of chemicals only. This estimate assumed conversion of the entire market to ammonium EDTA cleaning, which was considered an unlikely prospect.

Halliburton sales personnel gave quotations to customers for ammoniated EDTA jobs during 1975 and 1976. Some of these bids were awarded to Halliburton, but Halliburton management still adhered to its decision to refuse to permit actual performance of such jobs. Jobs at Detroit Edison, Northern Indiana Public Service, and Columbus and Southern Electric were successfully negotiated by Halliburton salesmen, but were not performed due to Halliburton's management decision. In May 1976, Engle arranged a number of customer contacts in the Chicago district to discuss cleaning with ammoniated EDTA, but was stopped by Hathorn, Halliburton's Vice-President of Research and Development.

In September 1976, John Dillman, manager of Halliburton's Pittsburgh Division, raised the question of reversing Halliburton's management decision concerning ammoniated EDTA. In a letter, he stated:

John Tregoning said Don Hathorn made the decision to stop pursuing MACOR. [Halliburton's accused ammoniated EDTA process]. He also requested me to send him a memo pointing out the increasing popularity of Vertan 675 (ACR) (MACOR), the tremendous potential its usage represents, our cost and

bidding price and any other comments deemed important.... Briefly, in the year we were allowed to pursue this, we were coming to the point of harvest.... Many ... requested our bid on MACOR which we gave them, along with our optional recommendation of Citrosolv. The mere fact that we could give them a choice, sold several Citrosolv jobs once they made the cost comparison.

We no longer make this comparison. We still get many requests, but we decline bidding or discussing MACOR. As a company, and as individuals, we are embarrassed.

In October 1976, John Gatewood reported to Laboratory Technical Manager Harris:

Let me take this opportunity to bring you up to date on the Water Conference in Pittsburgh this week. In addition to the usual visiting at such a conference, this year there appeared to be two primary topics of interest and discussion with both Halliburton personnel and with customers.

One of these topics is ammoniated EDTA. Both John Dillman and Glenn Morris feel very strongly that Halliburton should go ahead and offer to customers the MACOR process which we began to do about a year ago. Morris states quite firmly that we are losing three million dollars a year in the Dwight, Illinois district alone by not using the ammoniated EDTA for boiler cleaning. John Dillman feels that Halliburton management made the decision to not go with EDTA based on projected revenue figures which were unrealistically low.

John Dillman completed a market survey on Vertan 675 and MACOR in the fall of 1976, and reported that:

Based on a conservative survey of the usage of the reference subject by all IC locations in the Pittsburgh Division, it is estimated that $7,214,000 are spent per year for boiler cleaning....

Prior to our position of not being allowed to offer or quote on MACOR, we would use our MACOR quote to sell an optional

cleaning method using Citrolsolv which can be incenerated [sic] just as the Vertan or MACOR can. Since this time, we have declined to bid on MACOR and our Citrosolv work has declined to very near stopping.

As you are aware, we have started a more concentrated effort to get business in Western Pennsylvania. The big thing we have encountered is "Can you compete with D.I.S. on Vertan ACR," "If you can you can bid on our jobs."

Dillman further reported that Pennsylvania Electric had an upcoming boiler cleaning job, and that, "[w]e will get an invitation to bid but must be able to bid on the Vertan 675 (MACOR) portion or nothing at all."

By December 1976, Vice-President Hathorn of Halliburton was being repeatedly requested to reverse his decision concerning Halliburton's use of ammoniated EDTA in the MACOR process.

Mr. Hathorn was advised:

Our inability to utilize MACOR continues to plague us daily....

More and more of our customers are asking for competitive bids utilizing Ammoniated E.D.T.A. Many times a total system cleaning will be predicated on our ability to clean the boiler using ammoniated E.D.T.A. If we cannot do the boiler using this material, we lose the entire system....

As you can see, time is of the essence. Any effort you can make that will allow us to recoup this lost market, as well as take advantage of the expansion that will be caused by the July, 1977, E.P.A. Standards ... will be appreciated.

In February 1977, Glenn Morris of Halliburton complained about the inability to use ammoniated EDTA and stated:

We are having some problems getting hydrochloric acid as you know. It has become very expensive and will go higher. It is also causing a great amount of disposal problems for our customers.

....

We have lost many thousands of dollars because of Vertan.

....

Let's go with MACOR.

On March 2, 1977, Dillman reported on numerous customers unwilling to accept Citrosolv or ammonium bromate, Halliburton processes in competition with Vertan 675, and stated:

As stated many times, we need to be able to quote on MACOR for iron and copper removal, more especially after July, 1977, when E.P.A. regulations for discharge of waste water and chemicals goes [sic] into effect. After permission is granted, we still have a long road ahead.

....

Finally, there is every indication from throughout this entire division that Vertan 675 (ACR) will be *the* chemical cleaning solution and method in the majority of cases....

Sometime between March 2 and March 21, 1977, Halliburton's management reversed its position on Halliburton's use of ammoniated EDTA processes. On March 21, 1977, Dillman announced that "[w]e are now free to bid and use MACOR for all phases of chemical cleaning. This includes operational cleaning for removal of Fe and Cu."

### F. Halliburton's Failure to Develop a Noninfringing Process With the Ammoniated Dequest Chelant

In December 1969, following the aborted meeting with Dow to discuss the possibility of obtaining a license of the Vertan 675 Process, Halliburton's technical personnel Engle, Frost, Smith and Knox met to formulate a research program to "look at other possible systems for simultaneous copper and magnetite removal" because of Dow's infringement notice to Halliburton of the Lesinski patent.

Halliburton's technical team wanted to develop a high pH alkaline process as a replacement for Dow's ammonium EDTA system. They rejected HCL, CA and sodium EDTA, and turned to chelating materials commercially available from Monsanto

Chemical Co. under the trademark "Dequest."

The Dequest materials were chelant chemicals advertised by Monsanto for use in complexing metal ions such as iron, copper, etc., and as having the same "or superior metal sequestering properties as EDTA."

The Dequest chelants are phosphoric acids as opposed to alkylenepolyamine tetraacetic acids. By March 19, 1970, a first report of the early results obtained from using such materials was made by Dr. Frost, who acknowledged that the Lesinski patent "is worded such that it covers all ammonium or amine salts of alkylenepolyamine polycarboxylic acids."

Dr. Frost received the assignment of the development of a high pH solvent from Francis Anderson, Halliburton Laboratory Manager. Frost's belief was that in locating Dequest materials he had "a series of inexpensive and commercially available chemicals which offer an alternative to, and possibly an improvement over, EDTA and other alkylenepolyamine polycarboxylic acids."

By May 1970, Frost completed his initial evaluations in the laboratory, and concluded that the Dequest materials best dissolved magnetite, $Fe_3O_4$, at an acid pH of 4–6, but that Dequest 2010 was able to dissolve magnetite at a pH as high as 8.5 at relatively high temperatures.

After considering the initial results with Dequest reported by Dr. Frost, Preston Engle advised Halliburton's Lab Supervisor, Knox, in July 1970, that additional testing and a number of questions had to be answered before a field trial could be carried on with the Dequest process. In December 1970, Engle further advised that such studies should be done as quickly as possible.

In August 1970, Halliburton offered a commercial cleaning process for dissolving iron oxide which does not infringe the claims of the Dow patents in suit. That process uses tetrasodium EDTA solvent in conjunction with dextrose as an added re-

ducing agent for removing iron oxides from ferrous surfaces. This process employs an aqueous solution at a pH of 10.5 at a temperature not exceeding 200° F, because dextrose decomposes at temperatures above that level, and, without the added dextrose sugar, the ability to dissolve iron oxide is lost. Even with the added reducing agent, sodium EDTA is not competitive with ammonium EDTA for boiler cleaning.[1]

In October 1971, Dr. Frost reported that at temperatures of 180°—300° F, the performance of Dequest 2010 was equal to ammoniated EDTA.

In April 1972, Dr. Frost, as co-inventor with Knox and Martin, filed for patent on a method for removing magnetite scale from a metal surface using Dequest chelants at an alkaline pH. The patent issued in December 1974 with 14 claims. The process of claim 1 uses an aqueous Dequest solution at a pH of 9 to 10.25 and a temperature of about 180° to 300° F for a contact period of at least an hour to dissolve magnetite from a ferrous metal surface.

By September 1972, after almost two and one-half years of research, Dr. Frost reported that the Dequest 2010 material at pH 9 to 9.5 was a satisfactory solvent for boiler scales and was ready for field trial.

The impetus for trying Dequest in the field was the pressure of customers requesting that Halliburton supply a process competitive with Dow's ammoniated EDTA Vertan 675 Process. Laboratory Technical Manager Harris was advised in October 1974:

> We desperately need a material competitive with ammoniated EDTA. Our largest customer (blank) insisted on bids on the use of this formulation for a recent job at the (blank). The job was to do a chemical clean on a boiler showing evidence of hydrogen damage. The recommendation to stay on the alkaline side all the way was made by (blank). We were

advised by Duncan that we could not bid on ammoniated EDTA, due to competitive patents....

In November 1974, a commercial power plant boiler cleaning job was attempted by Halliburton using the high pH Dequest solvent, ammoniated HLX–157. The cleaning attempt produced "substantial amounts of undesired white precipitate," which was considered to be a serious deficiency.

Since the heavy precipitate experience using the Dequest compounds in November 1974, Halliburton has not used, or recommended the use of, Dequest chelating solvent a high pH for the removal of iron oxide scale from utility boilers.

Dequest compounds are currently used by Halliburton in an acid process for removing iron oxide scale from ferrous surfaces under the name "Alkleen." The Alkleen process operates at a pH between 4 to 7 and at temperatures between 150° and 175° F. The Alkleen acid process is used by Halliburton for dissolving iron oxides, but is not used in competition with Dow's Vertan 675 ACR Process in the cleaning of utility boilers.

### G. Defendant Halliburton's MACOR Process

Halliburton adopted the name MACOR, an acronym for *MA*genite-*CO*pper-*R*emoval, for its alkaline ammonium EDTA solvent cleaning process in about 1975, and on occasion has applied the name MACOR to a process for removing iron oxide only.

The first use by Halliburton of the MACOR process alleged to infringe claim 6 of the Lesinski patent occurred on May 16, 1977, at Pennsylvania Power and Light Company, and removed only iron oxide from the boiler ferrous surfaces. In that job, the procedures employed were those of the MACOR field bulletin then in effect, except that the MACOR concentrate that was used did not contain hydrazine, a

---

**1.** In 1977, Halliburton's Bradley stated that at alkaline pH sodium EDTA is not as aggressive as ammonium EDTA, even when used with an added reducing agent, and accordingly is a somewhat indifferent cleaning agent. Halliburton's Frost also stated in 1977 that the only high pH solvents which really work well are the ammoniated EDTA solvents.

chemical reducing agent, and no nitrite or air blow was used to achieve passivation. The boiler had to be drained as a result of formation of precipitates caused by a shortage of EDTA. Halliburton considered the cleaning successful.

The MACOR process employs the same steps that are used in removing iron oxide with Dow's Vertan 675, including preparation of an aqueous ammoniated EDTA solution having a concentration of about 39.5% and pH of about 9. The concentrate is injected into a boiler to be cleaned to produce a diluted solution of about 5–10% ammoniated EDTA in the boiler, and the temperature is raised to the range of 250° to 275° F. The solution is circulated through the boiler and contacted with the scale on the boiler tube walls and on other ferrous surfaces to remove the iron oxide scale. At the completion of the iron oxide step, the temperature of the EDTA solution is cooled to about 150°, the solution is adjusted to contain up to 1% free EDTA in the form of its ammonium salt, sodium nitrite is added, and air is injected and continued until the copper is dissolved and the ferrous boiler surfaces are passivated. The injected air and the added sodium nitrite both perform the same functions, viz., they are used to oxidize the iron chelate of EDTA for copper removal. During the copper removal stage, the degree of spetness, i.e., the ratio of iron-complexed chelate over the sum of the free chelate and the iron-complexed chelate is maintained at about 75%.

The MACOR solution is brought on the job in a concentrated form containing about 39.5% EDTA and is put into the boiler and diluted. The concentrate has a pH of 9 at room temperature but when injected into the hot boiler has a pH below 8. A MACOR Technical Data Sheet stated that the MACOR service removes scale from heat exchange surfaces at a pH of 9 and at a temperature of 240° to 275° F. Halliburton's Bradley admitted that the MACOR process "primarily follows the teachings of the Lesinski and the Harriman patents."

Shortly after March 1977, when Halliburton reversed its prior stance and authorized Halliburton field salesmen to solicit ammoniated EDTA boiler cleaning jobs, Halliburton salesman Stewart obtained from Metropolitan Edison in Reading, Pennsylvania, a copy of Dow's Vertan 675 ACR Process procedure on an earlier cleaning of the Titus No. 2 boiler, and forwarded the procedure to Dr. Frost in Duncan, Oklahoma, stating "here is some good information that I feel we could use as a guide in our first few MACOR projects."

In October 1977, Halliburton cleaned the Metropolitan Edison Titus Boiler No. 1 at Reading, Pennsylvania. The procedures used were substantially the same as those set forth in Dow's earlier Vertan 675 ACR cleaning of the Titus No. 2 boiler, except that Halliburton added sodium nitrite to air for oxidizing during the copper removal stage.

On another occasion, Halliburton took a copy of the Dow 675 ACR Process specification for an earlier job and merely crossed out the name "Vertan" and substituted "MACOR" and crossed out "Dow Industrial Service" and inserted "Halliburton Services" as supplier of the exact materials and procedures specified in the earlier Dow job. The MACOR process is in fact a copy of Dow's Vertan 675 ACR Process, and in all material matters the field procedure for each is the same.

## V. THE '065 LESINSKI PATENT

### A. The '065 Invention

The '065 patent teaches a method for chemically removing iron oxide scales from metal surfaces, such as the interior walls of the tubes in a steam generating utility boiler, by the use of an alkaline aqueous solution of an ammonium salt of EDTA at a pH of 8 to 11.

The '065 patent is based on the discovery by Chester Lesinski on February 17, 1961, that aqueous alkaline solutions of ammonium EDTA having a pH of about 9 will dissolve iron oxide scales from a metal surface whereas the aqueous solution of

the sodium salt of EDTA at the same pH will not dissolve the same iron oxide scale at nearly as fast a rate under the same conditions as shown in Examples 2 and 3 of the specification.

Lesinski's formal education consisted of one year in junior college and one year in pharmacy school at the University of Michigan. He joined Dow approximately twelve years prior to his invention disclosed in the '065 patent. Lesinski worked as a chemist for Dow prior to 1960, and in 1960–61 he conducted research relating to processes for scale removal from metal surfaces. Prior to moving from Midland, Michigan, to Cleveland, Ohio, to work in the Dow Industrial Service (DIS) laboratory, he conducted a trial cleaning job at Fisher Body Division of General Motors in Pontiac using an acid solution of sodium EDTA at a pH of 6 to dissolve operational scale deposits from a welder water cooling system. During that job, leaks developed in the piping because of corrosion, nearly causing a plant shutdown. After that experience, Lesinski maintained an interest in developing an alkaline chelating solution which would be less aggressive toward metal.

In Cleveland, he did some work with sodium salts of EDTA, and knew that sodium EDTA at an alkaline pH was inefficient in removing iron deposits. He also did some work with addition of chemical reducing agents to sodium EDTA solutions to see if he could accomplish the dissolution of iron oxide scales at alkaline pH.

Having that background, Lesinki listened to a presentation in the laboratory of the DIS Cleveland group by Dr. Gordon Bell of the Charles Pfizer Company, who discussed dissolving iron oxide scales with acid solutions of ammonium citrate using Pfizer's then new Citrosolv process. Dr. Bell described a two-stage process. The first stage involved using an ammoniated citric acid solution at an acid pH of 3 to 5. The second stage involved adjusting the pH to an alkaline range with ammonia. Dr. Bell did not mention the use of neutral or alkaline citric acid solutions for use in dissolving iron oxide.

During Dr. Bell's presentation, Lesinski realized that he had never tried the ammonium salt of EDTA to dissolve iron oxide scale. Lesinski went back to his laboratory, prepared a solution of Versene acid (EDTA) and water by mixing ammonium hydroxide until the pH stabilized at around 9. He took sections of boiler tube available in the laboratory to a local machine shop and had them cut it into short lengths of about 8 inches. He then inserted one of the tubes in a beaker containing the test solution and brought the solution to boiling on a hot plate. He smelled ammonia evolving, and periodically added ammonium hydroxide to maintain a pH of 9. He noted fast dissolution of the black scale on the inside surface of the tube, and after about a half hour of boiling, found that it was clean bare metal. After flushing the tube with water and air drying, he noted that there was no after-rust visible on the clean section, although the unsubmerged top section of the tube still contained the operational deposits. The boiler tube test was performed by Lesinski on February 17, 1961, and was recorded in his handwriting in his notebook.

On February 24, 1961, Lesinski performed in the Cleveland DIS laboratory the scale dissolving tests that appear in the '065 patent as Examples 2 and 3.

Example 2 was run using ammoniated EDTA solution at a pH of 9 by placing a laboratory scale sample, most magnetite, $Fe_3O_4$, in the solution, raising the solution to a boiling temperature, and maintaining boiling for three hours, during which time periodic additions of ammonium hydroxide were made to maintain the pH at about 9. Lesinski used the same procedure of adding ammonium hydroxide during the boiling of the scale sample in Example 2 that is reported in his notebook.

Example 3 was performed using the same procedure as described for Example 2 except that the scale sample was mostly hematite, or red iron oxide, $Fe_2O_3$, that was available to him in the laboratory. The details of Examples 2 and 3 were recorded in his handwriting in his notebook under

the date of February 24, 1961, and record the actual results which he obtained at that time.

In June 1961, Lesinski returned to his laboratory job in Midland. In July or August of 1961, he assisted in the experimental cleaning job of the Dow boiler at Midland using ammoniated EDTA solution at a pH of 9, helping with the analytical work. Lesinski then assumed other duties with Dow and has not worked further in the field of chemical cleaning.

### B. Level of Ordinary Skill in the Chemical Cleaning Art

■ The art is broadly the field of chemical cleaning, and one of ordinary skill in that art has general familiarity with inorganic and organic chemicals known to have ability to dissolve metal, some practical experience or knowledge of commercial cleaning and metal scale removal operations, such as removing rust, hardness scale, iron and copper deposits from metal surfaces, and the like. Such a person may have but does not necessarily have, a college degree in chemistry or related science, and does not necessarily possess a high level of theoretical understanding of the mechanisms of dissolution of metal scales, or passivation, or corrosion of metal surfaces, but does have knowledge of previously used cleaning chemicals and processes.

### C. Scope and Content of the Prior Art

Prior to the date of filing of the original Lesinski application, EDTA, a polycarboxylic acid, was recognized as the best and most versatile of the chelant. It was known that divalent ions, including ferrous ions ($Fe++$), were readily chelated at alkaline pH with EDTA, whereas trivalent ferric ions ($Fe+++$) presented difficulties. Also, at highly alkaline pH, ferric ions tended to precipitate from EDTA solution. EDTA had been used to chelate copper, iron, calcium, zinc, lead, nickel, and cobalt. The ability of EDTA to form chelate complexes with metal ions was known to be a pH-dependent phenomenon, and chemical cleaning with EDTA had been conducted at various pH's in an attempt to optimize the rate of dissolution.

Prior to the Lesinski invention, sodium EDTA had been used successfully to remove iron scale from boilers and similar devices such as engine cooling systems and sugar evaporators, but at alkaline pH of about 9 and above, added reducing agents such as dextrose sugar or sodium sulfite were used to convert ferric ions to more easily chelated ferrous ions. The problem of precipitation of ferric complexes from EDTA solutions at pH 8–10 also could be overcome by adding a reducing agent to the solution. The prior art contemplated the equivalence of sodium, potassium, or ammonium EDTA in chemical cleaning. It was also known that the addition of ammonia to raise the pH of an EDTA solution containing complexes of di- and trivalent metals, other than iron (III) would not induce precipitation; that in an iron (III)–EDTA system, precipitation occurs in basic solution and that EDTA is an effective complexing agent for iron (III) only in acidic or neutral solutions.

The Citrolsolv process disclosed in Pfizer's U.S. Patent 3,072, 502 to Alfano, and his October 1961 publication, are included in the prior art. As noted earlier, the Citrosolv process employs ammoniated citric acid (CA), a polycarboxylic acid. CA and EDTA both are organic acids having multiple acid groups (CA has three, EDTA has four), which in solution can form complexes, or chelates, with metal ions that keep those ions in a dissolved or "sequestered" state. Both materials had been used to chelate copper and iron. While EDTA is a better chelant because it forms stronger complexes, and is more versatile than CA, this was generally recognized long prior to the alleged Lesinski invention. Both chelants had been disclosed for use in chemical cleaning to remove iron scales prior to the Lesinski invention.

The Citrosolv process, however, involves the use of a solution of CA ammoniated to a pH of 3 to 4 and heated to about 200° F to dissolve magnetite, followed by cooling the solution to 150° F, raising the pH to 9.5

to 10 by the addition of ammonia, and then adding .5% sodium nitrite generally combined with intermittent air sparging to oxidize and remove copper. The Citrosolv process thus differs from both the Vertan and the MACOR process using ammoniated EDTA in that it requires a change in the cleaning solution from acid to base, i.e., from a pH of 3.5 to 4 to a pH of 9 to 10, when the process is employed to remove both iron oxide and copper scale. The process also employs chemicals such as ammonium carbonate, and sometimes ammonium bifluoride, not employed with EDTA. Furthermore, ammoniated CA at alkaline pH is not effective to dissolve boiler tube iron oxide scale, and while it will dissolve scale at neutral pH, it is not practical for such and has not been used to clean utility boilers at neutral pH.

. The Citrosolv process thus gave those skilled in the art a reason to prefer ammoniated EDTA chelants over other types of chelants in a process which dissolves iron oxide from a metal surface at acidic pH, with the solution pH then adjusted to the alkaline range to dissolve copper. The prior art teaching that ammonia added to EDTA would not precipitate divalent or trivalent ions at highly alkaline pH was confined to the complexation of trivalent ions other than iron (III) and gave those skilled in the art no reason to prefer ammoniated EDTA chelants over sodium EDTA chelants which were known to be capable of dissolving iron oxide scale at an alkaline pH only in the presence of an added reducing agent.

### D. Contemporaneous Teachings

The Mamet-Vlasova Russian article published in November 1962 reported the results of tests and investigations in boiler cleaning primarily with regard to magnetite iron scale removal with chelants. EDTA, sodium EDTA, ammonium EDTA, CA, and ammoniated CA are all discussed and used in the tests. The article states that of these chelants, EDTA neutralized with ammonia shows the highest ability to dissolve iron oxide scale. The article states

that the optimum pH for sodium EDTA solutions and ammoniated CA solutions is 4, and that pH of the sodium EDTA solution may be raised to 8–9 to protect against corrosion; it further states that "[t]he possibility of raising the pH-value of citrate solutions is not yet clear." Use of ammoniated EDTA at alkaline pH is not discussed. The teachings of the article regarding use of ammoniated EDTA at alkaline pH, if any, are so abstruse as to be useless, and clearly do not reflect Lesinski's invention.

The Bell U.S. Patent 3,248,269 filed August 15, 1962, entitled "Scale Removal," presents a contemporaneous disclosure that ammoniated CA at neutral and alkaline pH can be used to dissolve iron oxide scale. As noted earlier, however, this process in fact is not effective at alkaline pH, and, at neutral pH, will not dissolve scale in a commercially feasible manner.

E. Claim 6 of '065 Patent (Claim 6 of Re. 30,796)

A process for removing

(1) hardness scale and one or more iron oxide-containing deposits of the group of $Fe_2O_3$–containing and $Fe_3O_4$–containing deposits

or

(2) one or more iron oxide-containing deposits of the group of $Fe_2O_3$–containing and $Fe_3O_4$–containing deposits

(3) from a metal surface containing one or more of the aforesaid hardness scale and iron oxide-containing deposits

(4) by contacting said metal surface with an aqueous alkaline saline solution having a pH of 8 to 11, the active ingredient of which consists of at least one salt of the group consisting of ammonium ... salts ... of alkylenepolyamine polycarboxylic acids ... wherein the alkylenepolyamine polycarboxylic acid salt of the alkaline saline solution employed is a salt of an acid of the formula $(HOOCCH_2)_2N[Ch_2)nNCH_2COOH]_mCH_2COOH$ wherein n is 2, m is 1

(5) for a time sufficient to dissolve said hardness scale and said iron oxide-containing deposits.

Ammoniated ethylenediamine tetraacetic acid (EDTA) is a salt which is covered by the formula, and is the compound when m is 1 and n is 2.

### F. Prosecution History of Lesinski '065 Patent

The prior art known to the Patent Office and relied on before claim 6 was allowed on November 30, 1966, appears in the file history of the parent application filed July 23, 1962, and in the continuation-in-part application (CIP) filed July 22, 1963. The original claims in the 1962 parent application and the CIP were broader than the claims which appear in the '065 patent.

In the only office action on the parent application, the Patent Office rejected all claims on two Bersworth patents and a 1952 publication by Geigy Industrial Chemicals entitled "Sequestrene." Bersworth I, U.S. Patent 2,396,938, taught, in 1946, an alkaline solution consisting of sodium and potassium EDTA salts and a basic material for removal and prevention of scale formation in water boilers. The Sequestrene catalog taught that ammonium and alkylolamine salts of EDTA are old, and that EDTA generally is well suited for treating water systems. Bersworth II, U.S. Patent 2,544,649, issued in 1951, was relied on for showing the combination of an alkanolamine and salts of EDTA, or EDTA, in treating water systems.

In its first action in the CIP application, the Examiner noted that claims 1–9 were of the same scope as the claims in the parent application and rejected all of them on the same prior art as in the parent application. Dow then amended the claim from one requiring ammonium EDTA as "an essential constituent" to one wherein the active ingredient "consists of" ammoniated EDTA.

Also, Dow attempted to distinguish the claims on the basis that the claimed invention uses amine salts of EDTA, not alkali metal salts, to dissolve "an otherwise insoluble scale," whereas Bersworth I requires two salts, neither of which was an amine salt, or one alkali metal salt and a free base, and the Sequetrene publication showed amine salts of EDTA but mentioned no uses for them, while Bersworth II showed alkali metal salts to inhibit precipitation of metal ions in solutions but contained no teaching concerning dissolving scale deposits and iron oxide deposits from a metal surface using amine salts of EDTA. Dow attempted further to distinguish the claims on the basis that alkali metal salts of EDTA are ineffective to remove iron oxide scale at pH greater than 8, and on the basis that while the Sequestrene publication taught that EDTA and its salts would remove rust and tarnish when used with added reducing agents, its process did not use an added reducing agent.

The Patent Office rejected Dow's distinctions and gave a final rejection of all of the claims, relying on the Sequestrene publication for metal cleaning uses, and the fact that alkaline solutions for preventing scale were old, to find that it would be obvious to one skilled in the art to combine the references to form the claimed composition. Dow then appealed the Examiner's rejection to the Board of Appeals.

Dow argued to the Board of Appeals that the term "Sequestrene" referred to EDTA acid, and that while the Geigy publication offered the sodium salt of EDTA, ammonium EDTA salts were not offered, and the publication mentioned no use for ammonium salts. Additionally, Dow argued that alkaline metal salts of EDTA are unable to dissolve iron oxide deposits at alkaline pH, or to achieve inherent passivation. Dow also presented the Lesinski affidavit, and argued to the Board that the affidavit supported "the unusual and unexpected results" obtained with ammonium EDTA salts relative to alkali metal salts at a pH of 9.

In response to Dow's brief on appeal, the Patent Office dropped its prior rejections, reopened prosecution on the basis that a clear issue had not been reached, and re-

jected claims 1–8 on three newly cited references. The Examiner relied on Flaxman, U.S. Patent 2,802,788, issued in 1957, as anticipating claims 1, 2, and 5–7, including claim 6 of the '065 patent in issue. The Examiner relied on Yonkman, U.S. Patent 1,523,741, issued in 1925, for teaching ammonium citrate to dissolve rust from a metal surface and thereafter rinsing, taken in combination with Flaxman, to make claims 3 and 4 obvious. Claim 8, a method of passivating with amine EDTA salts was rejected as anticipated by Arensberg, U.S. Patent 3,099,521, issued in 1963, and Tucker, U.S. Patent 2,264,103, issued in 1941.

The originally submitted Lesinski claims required merely an "alkaline" pH as opposed to one within the specific alkaline range of 8–11. Also, both the parent and continuation-in-part Lesinski applications disclosed ammoniated CA as being the equivalent of ammoniated EDTA, and claimed the use of ammoniated CA at alkaline pH as Lesinski's invention. In response to this rejection based on prior art, Dow's claims were narrowed to exclude CA, to exclude processes in which the solvent was contacted with the scale at a pH other than 8–11, and to exclude specifically processes in which a reducing agent was added. Dow also defined the scale as hardness scale, or iron oxide scale, or both.

With respect to Flaxman, Dow argued that Flaxman teaches removing iron rust and other oxides from cooling systems of automobiles with a solution having four required constituents: a grease emulsifier; a reducing agent such as sodium bisulfite; an inorganic sequestering agent such as sodium tripolyphosphate; and sodium EDTA, or alternatively, an amine salt of EDTA. Dow attempted to further distinguish Flaxman as to pH, arguing that Flaxman taught use of solutions at pH's below 8 because the solution at pH above 8.5 was too slow to be practical for removal of iron rust. Dow also attempted to distinguish Flaxman on the basis that in Dow's claims, no reducing agent is necessary, meaning, in context, no added chemical reducing agent such as sodium bisulfite.

Dow sought to differentiate Yonkman on the basis that it relates to acidic ammonium citrates, and should not be combined with Flaxman due to pH differences. Dow argued against Arensburg and Tucker urging that they address prevention of scale and precipitation of hardness scale, rather than dissolution of scale.

The Patent Office rejected Dow's argument over Flaxman and Yonkman, but entered Dow's amendment for purposes of appeal, and Dow appealed a second time and filed a brief. The Examiner reversed his position without explanation, allowed all of the claims, and the '065 patent issued on March 7, 1967.

### G. Prosecution History of the Lesinski Reissue

On September 9, 1978, Dow filed an application to reissue the '065 patent in order to obtain consideration of prior art identified by Halliburton in its July 1978 answers to Dow interrogatories Nos. 1–23, and consideration of other information not previously considered by the Patent Office. The reissue was sought under 35 U.S.C. § 251 and Patent Office Rules, 37 C.F.R. §§ 1.171–1.179, that were amended in 1977 under the direction of then-Commissioner of Patents Dann. Under the amended rules, reissue could be requested without admitting the original patent was partially invalid, and such was Dow's allegation with respect to claim 6, the claim in issue here. In the application, Dow filed a copy of Halliburton's answers to Dow interrogatories 1–23, a list of Halliburton's privileged documents, copies of three Halliburton attorney opinions of invalidity of the '065 patent, and Halliburton's answer and counterclaim.

In addition, Dow brought to the attention of the Patent Office with the filing of the reissue patent application that prior art which it considered most relevant to the claimed invention. This art included the patents cited during the prosecution of the '065 patent, seven of the references cited by Halliburton in their answers to Dow's

interrogatories, and eleven other patents or references which Dow considered relevant.

In the first office action, Examiner Albrecht cited many of the references identified in Halliburton's answers, including Bersworth and Singer U.S. Patent No. 3,033,214, publications identified by Dow, including the Mamet-Vlasova Russian publication, and patents not called to his attention by Dow that were located in his own prior art search. He rejected claim 7 directed to the method of passivating a ferrous metal surface on the basis of Flaxman, Arensberg, and a reference identified by Halliburton. After obtaining a copy of the Russian reference, he ruled that the effective date against prior art of claim 6 is July 23, 1962, and that the Russian reference published in November 1962 is not prior art to claim 6; he similarly ruled that Bell U.S. Patent No. 3,248,269 is not prior art.

In deciding that there was invention in claims 1–6, Examiner Albrecht stated:

Claims 1–6 have not been rejected on prior art grounds over Bersworth VI either alone or in combination with any other of the prior art references of record because of the affidavit filed during the prosecution of the parent application. The striking superiority of the ammonium salt over the corresponding sodium salts in removing iron oxides in the recited pH range as well as hardness scale is not only unobvious, but is extremely desirable in the art and solved a serious problem in the industry. Neither Bersworth VI (3,033,214) or any of the other prior art references suggest that the recited ammonium or amine salts would be so strikingly superior to the corresponding sodium salts in this respect at the recited pH range.

In rendering his decision, the Examiner thus heavily relied upon the results set forth in the Lesinski affidavit which had been submitted during the prosecution of the '065 patent.

During prosecution, Examiner Albrecht suggested to Dow's counsel Kanuch that Halliburton should be a party to the reissue proceedings and that he was interested in Halliburton's interpretation of the prior art. The examiners and other officials of the Patent Office requested that Dow keep the office informed of the status of this litigation and keep it apprised of "any and all defenses" asserted by Halliburton, and the "reasons for Halliburton's belief that some or all of the instant claims may be unpatentable under 35 U.S.C. 102 or 103." Assistant Commissioner Tegtmeyer stated that "Applicant is required to keep the Office advised of the status of these civil actions ... and to submit to the Office any information developed therein, or in relation thereto, which is material to the examination of this application."

Even though Assistant Commissioner Tegtmeyer formally invited Halliburton to protest under 37 C.F.R. 1.291, Halliburton did not formally protest nor attack claim 6, except by way of voluntarily advising Examiner Albrecht about the "relevant, correct" opinions of invalidity of the '065 patent on the day prior to Kanuch's first interview with Examiner Albrecht on April 18, 1979.

In appraising the patentability of the claims of the '065 patent relative to the prior art during the reissue application prosecution, primary Examiner Albrecht stated:

The Examiner has been asked by the Assistant Commissioner for Patents in the Decision mailed November 29, 1979 (Paper No. 10) to indicate the closeness of the Bersworth patent (3,033,214) to the prior art of record and to further indicate whether or not said Bersworth '214 patent would have been important in deciding whether to allow the application which issued as Patent No. 3,308.065 (sic). Since none of the instant claims are rejected over any of the prior art presently of record, the Examiner cannot make any comparison of Bersworth '214 to any reference relied upon to reject any of the instant claims. Comparing Bersworth '214 to the other prior art of record including the prior art cited during the prosecution of Patent No. 3,308,-

065 and the additional prior art made of record in the instant reissue application, the Examiner believes that said Bersworth '214 patent is no closer and probably less close to the instantly claimed subject matter than said other prior art references. Bersworth does little more than disclose that alkali metal and ammonium base salts of various aminocarboxylate chelating agents may be used for removing scale from boilers. Bersworth '214 teaches that the sodium and ammonium base salts would be expected to be equivalent in performance in such applications. Bersworth '214 contains no recognition that any of the possible salts suggested by this disclosure would provide any substantial advantage over the preferred salt used in Bersworth's preferred examples which is the sodium salt. The discussion in column 5, lines 50–61 of Bersworth '214 would be recognized by one of ordinary skill in the art as a reference to the prior art practice described in Bersworth 2,544,649 which involved the use of an alkali metal salt, such as the sodium salt of the sequestering agent, in admixture with triethanolamine which is something entirely different than the use of the sequestering agent neutralized by triethanolamine in the absence of any sodium ion. It is noteworthy that none of the specific working examples in Bersworth '214 involve the use of an ammonium or substituted ammonium salt of the chelating agent during a process of removing any type of scale at any pH. It should be further noted that none of the specific working examples in Bersworth 214 disclose removing $Fe_2O_3$ or $Fe_3O_4$ deposits at a pH of 8 to 11 as is required by all of the instant claims. It should be noted that the patentability of the instant claims is based upon the totally unexpected and surprising fact that alkali metal salts such as sodium are not equivalent to the corresponding ammonium or ammonium base salts at removing the instantly recited iron oxide scales at a pH of 8 to 11 as recited in the instant claims. As is shown by the affidavit of Lesinski dated May 21, 1965, a copy of which has been placed in the instant application as Paper No. 6, the substitution of an ammonium salt of the recited type of chelating agent for the corresponding sodium salt results in a tremendous increase in the efficiency of dissolving $Fe_3O_4$ at a pH of 9. Using the ammonium salt of the instant claims, applicant obtains an almost 20–fold increase in dissolution of the iron oxide. Similar data appears in the body of the specification of the original patent and the instant reissue application. The Examiner has carefully reviewed the validity Opinions of Halliburton and concludes that they do not recognize that the instant invention is a "selection invention" which results in a huge improvement over the prior art materials actually used for the same purpose and solves a serious problem that has long existed in the art. Said Validity Opinions appear to be based on an assumption that one of ordinary skill in the art believed the alkali metal and ammonium or ammonium base salts to be equivalent. However, the instant invention is based on applicant's discovery that the ammonium and amine salts are distinctly not equivalent to sodium salts when used in accordance with the specific process limitations of the instant claims.

Examiner Albrecht further stated his opinion as to the closeness and materiality of the Bersworth '214 patent for the assistance of the Assistant Commissioner's decision on fraud:

... the Bersworth '214 patent is only important in making that decision to the extent that it is believed to be substantially cumulative to some of the prior art cited during the prosecution of said patent.

To the extent that it is important it is so because it in effect teaches away from the claimed invention because it fails to recognize the essential nonequivalence of the ammonium salts of the chelating agents as compared to the sodium salts of said chelating materials.

Examiner Albrecht completed his reconsideration of the cited prior art in the Halliburton opinions and the prior art applicable to allowed claims 1–6 on April 3, 1980, and then returned the application to Tegtmeyer for a decision on the alleged fraud issue. Assistant Commissioner Tegtmeyer found no fraud with respect to the Bersworth '214 patent.

Halliburton had forwarded a letter to plaintiff on June 26, 1980, setting forth all its defenses of invalidity and unenforceability pertaining to the Lesinski and Harriman patents and summarizing evidence proposed for support of those defenses, and on August 1, 1980, filed interrogatory answers incorporating these defenses. Prosecution on the merits was closed in both reissue applications after Dow had been informed of these positions, and Dow deliberately decided not to inform the Patent Office of any of the defenses set forth in the letter or the interrogatory answers. The art cited in the letter, however, was already before the examiner, and the "defenses" in the letter concerning invalidity and unenforceability were simply Halliburton's arguments and interpretations.

### H. Alleged Misrepresentation by Dow in Prosecution of the Original and Reissue Lesinski Patents

#### 1. pH

■ The pH number is an index to indicate the acidity or alkalinity of an aqueous solution. The pH is normally measured at room temperature, and a measurement not showing a temperature would connote measurement at room temperature to one skilled in the art. If the pH is 7, the solution is considered to be neutral; if the pH is above 7, it is alkaline or basic; and if the pH is below 7, it is acidic. The range of acidity and alkalinity extends from 0–14.

Halliburton asserts that claim 6 of the Lesinski patent is misleading, and intentionally so, in that the ammonium EDTA solution is said to contact the scaled metal surface at a pH of 8 to 11, while the pH of the solution is actually less at elevated temperatures of use in a boiler. While it is

true that the pH of the ammoniated EDTA is less than 8 at elevated operating temperatures, as numerically calculated, there is nothing misleading about the language of the patent.

The Lesinski patent in claim 6 defines the alkalinity of the ammoniated EDTA solution as being from 8 to 11. Examples 1 to 4 of the Lesinski patent connote to one skilled in the art that the measurement of pH was done at room temperatures, and not at the higher temperatures to which the solution was raised to speed up the rate of scale removal.

Halliburton admits that at the time of the Lesinski invention, no means were available to conduct pH measurements at temperatures above the boiling point of water. Halliburton's expert, Dr. Frost, testified that even today the only practical way of measuring pH in the field is to take a sample during cleaning, cool it to room, or ambient, temperature and measure it. The only evidence which involves the determination of pH of ammoniated EDTA solutions at elevated temperatures is evidence which was generated by Halliburton in connection with this litigation. That evidence is a calculation of a theoretical pH value for an ammoniated EDTA solution at the operating temperature for the removal of iron oxide, and measurements at elevated, but below boiling, temperature made in Halliburton's laboratory on samples taken on a MACOR job after suit was filed. The evidence shows that Halliburton's experts, although working extensively in this field since 1975, had no concept that the pH of the MACOR solution could be calculated at operative temperatures, and it was only through the publication of Dr. Martell's research paper in 1979 that Halliburton learned that through use of a computer program, one can calculate a change of numerical pH value of an ammoniated EDTA solution at the elevated operative temperature employed in the Vertan and MACOR processes.

Prior to that time, all of Halliburton's literature, procedures, research reports and

correspondence indicated that the MACOR cleaning solution has a pH of 9 during the cleaning step. A Halliburton Technical Data Sheet advertising its ammoniated EDTA MACOR process states that the pH of the ammoniated EDTA solution both before and during the cleaning job is at about 9; instructions prepared by Halliburton's technical experts for its field personnel on cleaning jobs using ammoniated EDTA state that the pH of the ammoniated EDTA solution both before the cleaning and during the cleaning is at about 9; logs generated by Halliburton in cleaning utility boilers using the ammoniated EDTA solution of the MACOR process routinely record pH measurements indicating the cleaning to have been conducted at a pH of 8 to 11; and the testimony of a Halliburton analyst attending such jobs confirms that pH measurements both before and during the cleaning operation are conducted at ambient temperatures.

Moreover, in a Halliburton-owned patent, in which Halliburton's witness, Dr. Frost, is a co-inventor, Halliburton describes the pH of the cleaning solution in substantially similar terms as are employed in the specification and claim 6 of the Lesinski patent. Dr. Frost testified that one skilled in chemical cleaning would know, even though there is no indication of the temperature of the pH measurement, that the pH measurement was done at essentially ambient temperatures, just as one skilled in the art would technically interpret the claims of the Lesinski patent as meaning pH measured at ambient temperature, which corresponds to pH measurements as practiced in the field using the MACOR process. Frost's testimony coincides with that of Dow's expert, Wayne Frenier, who testified that pH measurements of the cleaning solution employed meant a measurement of pH at room temperature to one skilled in art of chemical cleaning.

## 2. Reducing Agent

■ Halliburton claims that Dow misled the Patent Office when Dow distinguished the Lesinski process from prior art by as-

serting that its process required no chemical reducing agent. In fact, Halliburton's characterization of Dow's representation is what is misleading.

As heretofore noted, Dow distinguished the Lesinski patent on the basis that it neither needs nor requires a reducing agent added as a component of the ammoniated EDTA cleaning solution. The evidence establishes that dissolution of iron oxide scale from a ferrous surface with an ammoniated EDTA solution at alkaline pH proceeds largely by the mechanism of reductive dissolution, whereby the iron surface acts as a reducing agent to reduce poorly chelated ferric ions to more easily chelated ferrous ions. The evidence further establishes that the rate of dissolution of the more difficult magnetite, $Fe_3O_4$, is accelerated by the presence of the ferrous surface. This is not to say, however, that ammoniated EDTA at alkaline pH will not dissolve magnetite-containing scale in the absence of the reducing surface, and it is a far different proposition than adding a separate reducing agent to the cleaning solution, such as adding a reducing sugar to a sodium EDTA solution, which solution, absent the added reducer, will not effectively dissolve magnetite scale at alkaline pH even in the presence of an iron surface.

## 3. The Lesinski Affidavit

Lesinski testified that he conducted the tests described in Examples 2 and 3 of his patent in February of 1961 using laboratory scale samples, the exact composition of which is unknown, one of which contained as the major component magnetite, $Fe_3O_4$, and the second of which contained as the major component red iron oxide, $Fe_3O_4$. The tests were conducted as described in Examples 2 and 3 and the pH was maintained by periodic additions of ammonium hydroxide throughout the three hours of boiling. The results reported in Examples 2 and 3 are the actual results which he obtained at the time of running those tests and generally show that the ammoniated EDTA solution dissolved the scale samples between 16 and 19 times as

fast as sodium EDTA solution at the same pH. The purpose of these tests was to demonstrate the difference in reactivity between sodium EDTA and ammonium EDTA. In the affidavit submitted in support of his patent application, Lesinski swore that he performed the tests described in Example 2 of the application, viz., a solution was prepared by mixing a slurry of 100 ml. of 5 weight percent EDTA in water with concentrated ammonium hydroxide in amount sufficient to give a solution having a pH of 9. When the solution was boiled for three hours with 1.00 g. of $Fe_3O_4$, 0.98 g., or 98 percent, of the $Fe_3O_4$ was dissolved.

The preceding procedure, when repeated with the same quantity of EDTA slurry but dissolved with NaOH in amount to give a pH of 9, dissolved only 0.05 g., or 5 percent of the one gram $Fe_3O_4$ sample when boiled for three hours.

Halliburton contends the affidavit is misleading in that it does not disclose the respective pH shifts for the ammonium EDTA and the sodium EDTA at the elevated temperatures at which the scale was dissolved, and in that it does not accurately reflect the relative scale dissolving abilities of ammonium EDTA and sodium EDTA. The first contention is without merit for the reason stated at H.1, *supra.*

With respect to the second contention, Halliburton's Dr. Frost established that a chemist would know to add water in the Lesinski examples and to maintain pH at 9, and that Examples 2 and 3 relate to the solution of loose iron oxide scale. Tests conducted with commercially pure or powdered magnetite accordingly would not be comparable to tests of actual boiler tube scale. Furthermore, variances in temperature of the ammonium EDTA solution have a pronounced effect on scale dissolution, and, for temperatures at or above boiling, turbulence of the solution has a great influence on scale dissolution. The solution concentration of EDTA similarly is a significant factor. Particularly significant is the fact that even in tests using actual boiler tube magnetite-containing scale samples,

solubility among samples from different sources may vary by a factor of 10 as a result of divergent chemical compositions of the scale.

Reported test results in evidence from tests not performed with boiler tube scale samples, at or above boiling temperature, in solutions maintained at a pH of about 9 at ambient temperature, and with EDTA concentration of at least 5%, accordingly are entitled to little, if any, weight in assessing the validity of Lesinski's reported test results; such test results do, however, provide some indication of the relative reactivity of sodium EDTA and ammonium EDTA.

The results of Lesinski's tests have not been reproducible. In the only test report in which Halliburton employed actual scale samples and followed all of the conditions of Example 2, Halliburton obtained a wide variety of results. Solvent analysis of the six tests indicated clearly that in all instances the ammoniated EDTA was significantly more reactive than the sodium EDTA, the ratio of reactivity varying from 3.2 to 22. The solvent analyses, however, are not fully consistent with dissolution results reported on a weight loss basis, and are misleading in the sense that the sample demonstrating the reactivity ratio most favorable to ammoniated EDTA showed only 2 percent dissolution by weight loss. Ratio of reactivity on the basis of weight loss ranged from zero for two samples for which no dissolution by weight loss was reported, to 9:1 and 12.5:1 for the samples for which the greatest dissolution by weight loss was reported, 10% and 25%, respectively.

The only report of a test by Dow purportedly following all conditions of Lesinski's Example 2 is a report by Frenier dated May 15, 1981. Frenier reported 83% dissolution of the scale sample with ammoniated EDTA, and 24% dissolution of a sample of the same scale with sodium EDTA. The scale used in this test was specifically produced by Dow in an attempt to verify Lesinski's example, and was a type that would rarely, if ever, be found in

an industrial boiler. Even so, the reactivity ratio is only about 3.5:1.

In summary, all test results in evidence show significantly better dissolution with ammonium EDTA than with sodium EDTA, although the best dissolution of $Fe_3O_4$ by weight loss reported both by Dow and Halliburton, with the exception of the Frenier test discussed above, is about 25%.

Despite the facts that the Dow work was at all times in its possession, all of the Halliburton work was given to Dow, and Dow was fully aware of Halliburton's unenforceability defenses based on these data, Dow consciously and deliberately chose not to submit this issue to the Patent and Trademark Office in the reissue proceeding.

Ex-Patent Commissioner Dann, however, testified that Dow had no obligation to present to the Patent Office Halliburton's contentions, including the alleged inability to duplicate Examples 2 and 3, because the Examiner has no laboratory or technical assistance means to evaluate such allegations. He further testified that where there are good faith differences of opinion between the patentee and the alleged infringer as to the technical or legal correctness of the contentions, an applicant has no burden or duty to call same to the attention of an examiner who does not have the capability to resolve such differences of opinion in any event.

According to Dann, the test of candor on an applicant to satisfy the requirements of 37 C.F.R. § 1.56 is "materiality" of the prior art or other information after a good faith judgment has been applied to the material by the attorney for an applicant.

4. Field Procedures and Inhibitor Formulation at the Time of the Lesinski Application

At the time of filing the original and CIP applications for the Lesinski patent, Dow had developed field procedures for the two experimental Vertan 675 boiler cleaning jobs at its Midland and Freeport facilities. These procedures contain information such as the concentration of materials to be used, the length of time the solvent should be kept in the boiler, and the method of cleaning from a mechanical standpoint. This type of information obviously is important to the commercial success of a cleaning operation, as field personnel must have detailed instructions to conduct a job.

Dow also had developed a preferred corrosion inhibitor formulation for use in the Vertan 675 process prior to filing the application, viz., a combination of two inhibitors, A–121 and A–124. Contrary to Halliburton's contention, however, this is not the only inhibitor formulation which was satisfactory. In correspondence from Preston Engle to Nesbitt in October 1962, apparently regarding the upcoming job in Holland, Engle advised that a combination of A73 and A121 would provide good metal protection. Furthermore, A121 is the sodium salt of mercaptobenzothiozol, one of the inhibitors disclosed in the Lesinski patent as "found advantageous to add" alone or in combination with other corrosion inhibitors.

There is no evidence that failure of the Lesinski patent to disclose the above items results in any undue difficulty to one skilled in chemical cleaning determining how to practice the patented process, or that Lesinski did not disclose the best method contemplated by him for practicing the process.

## VI. THE '811 HARRIMAN PATENT

### A. Background

Copper is usually present in small quantities in recirculating water inside tubes in a steam generator and is normally present in the scale on those tubes to some degree. When iron oxide scale is dissolved by an acidic solution, or by an aqueous alkaline EDTA solution in accordance with claim 6 of the '065 patent, copper in the boiler water plates out on the cleaned iron surfaces that have been descaled. This copper must be removed because it causes serious galvanic corrosion if left in place when the boiler tubes are reheated for subsequent use.

The '811 patent teaches a method for removing copper from ferrous metal surfaces, particularly the tubes of high pressure steam generating boilers. The dissolving solution is alkaline and its essential constituent is the ferric chelate of ammoniated EDTA which functions to dissolve the copper by oxidizing copper metal to copper ions. In dissolving the copper, the ferric chelate is reduced to the ferrous chelate. In order to provide sufficient ferric chelate to dissolve copper, an oxidant such as air or sodium nitrite is added to oxidize the ferrous chelate back to ferric chelate. Copper ions are maintained in solution by chelation with free EDTA or ferrous EDTA chelate. It is essential to maintain sufficient ferric chelate in the solution to dissolve the copper; it also is important to maintain the iron chelates and free EDTA contained in the cleaning solution in a certain ratio referred to as the degree of spentness. The degree of spentness can vary from 60 to 100%.

As most advantageously practiced, the removal of copper from a boiler immediately follows the iron oxide removal stage of the Lesinski patent in one continuous single fill of the boiler with ammoniated EDTA. The solution is alkaline, and contains the iron chelate and sufficient free EDTA to meet the required degree of spentness. As stated earlier, both Dow and Halliburton employ the iron oxide removal process in combination with the copper removal step.

Copper is also dissolved during the iron stage and at the outset of the copper stage, but immediately replates back onto the boiler walls. This occurs as copper ions react with and plate on iron metal to produce copper metal deposit. It is only when no iron metal is exposed to the solution that copper is retained in solution and not replated.

Iron metal from the boiler becomes unavailable to react with copper ions in solution only after the exposed boiler surface has been passivated, that is, after the surface has developed a protective uniform film of iron oxide on its surface. This protective film presents a barrier between the underlying boiler metal and copper ions in solution. In order to dissolve and keep in solution any significant quantity of copper, the surface of the boiler must first be passivated. This requires that there be a certain minimum concentration of ferric EDTA before any copper metal can be removed and not replated.

After Dow commercially introduced its Vertan 675 process in 1962 and realized that it faced the undesirable copper replating problem, Dow initiated a research project to find an answer to the problem.

Before Engle left Dow in 1963, he worked with others on a project to develop a method to prevent copper from plating out in the Vertan process. As far as Engle knew when he left Dow in the fall of 1963, Dow had not developed a satisfactory system for removing copper with ammoniated EDTA.

This problem was the subject of research projects started in Dow's Freeport, Texas, laboratory late in 1962. In April 1963, a report was prepared summarizing the approaches followed by Dr. Teumac and Mr. Muehlberg.

The first approach was to find an additive that would prevent copper from plating out. The second approach was to create a micro-coating or barrier that would prevent reduction of ionic copper and thus prevent replating. The third approach was to deplate the copper already deposited on the clean metal surface by oxidizing it into solution. Some forty compounds were tested to locate one that would inhibit copper plating, and two compounds were considered to show some promise. The method of deplating by oxidizing "the major portion of the iron in the spent Vertan to the ferric state" was considered worthy of further consideration. Muehlberg was in charge of the research project and conferred regularly with Teumac and Harriman. In the course of the research, Teumac and Harriman used sodium nitrite alone, and air alone, to oxidize ferrous to ferric Vertan. Additionally, a report by Muehlberg considered using a combination

of air and sodium nitrite to inhibit corrosion, if necessary. They worked on the spentness requirements of the Vertan solution, i.e., the relative proportions of the ferric chelate to the total EDTA in solution which should be present. The mechanism by which the deplated copper was complexed and maintained in solution was first thought to involve the ammonium ion entering into the copper complex; later, cupric chelate of EDTA was identified as the material that was complexed after the copper was dissolved. The '811 patent describes the cupric chelate.

Dow Attorney Post prepared the '811 patent application based on the invention disclosure of July 1963, modified by later written information and information gained from a personal visit to the Freeport laboratories for discussion with Muehlberg, Harriman, Teumac, and patent liaison man Ancona. Post determined that the claimed invention was the joint invention of Harriman, Muehlberg and Teumac. Teumac testified by deposition, having left Dow's employment. While he signed the invention disclosure in July 1963 as witness to the invention described therein, he testified that he felt he was correctly named as a joint inventor along with Muehlberg and Harriman. Muehlberg, still a Dow employee, testified by deposition that since Harriman and Teumac contributed to the spentness concept and since they all conferred regularly and were researching the problem together, they were joint inventors.

B. Claim 6 of the '811 Patent (Claim 10 of Re. 30,714)

Claimed is process for removing

(1) copper from a ferrous metal surface containing copper thereon by

(2) contacting said surface with an aqueous alkaline solution wherein the solution employed contains as an essential constituent at least one member of the group consisting of

(a) ferric chelate of EDTA and

(b) mixtures of ferric and ferrous chelates of EDTA

(3) in an amount sufficient and for time sufficient at a reaction temperature above about 68° F and up to about 300° F to dissolve said copper

(4) wherein said solution may also contain a salt of the group consisting of ammonium, amine, and hydroxyalkylamine salts of EDTA and

(5) wherein the total iron chelate originally present ranges between about 60 and about 100 weight percent of the total salt form and iron chelate and

(6) the solution originally contains a total of between ca. 9.5 weight percent and up to a saturated solution of salt form and iron chelated chelating agent.

C. The Scope and Content of the Prior Art

Art prior to the Harriman application includes the Lesinski patent and its file history, the Bell patent, the Russian article, the Loucks article, "Chemistry Tackles Plant Maintenance," the Alquist patent, U.S. Patent 2,567,835, the Martin et al patent, U.S. Patent 2,959,555, the Alfano patent on the Citrosolv process, and the October 1961 Alfano and Bell publication "Chemical Removal of Magnetite and Copper." The body of prior art information available to a person skilled in the art at the time the Harriman invention was made also included the fact that at alkaline pH copper ions can be maintained in solution by complexing with ammonia or by chelation with EDTA.

In the prior art Citrosolv process, after the iron stage when the CA chelant is loaded with iron, the pH of the solution is adjusted to about 9.0, and an oxidant such as air or sodium nitrite is added to dissolve copper. While this bears an outward resemblance to the Harriman process, the chemistry is different. As noted earlier, the oxidant in the Harriman process oxidizes ferrous EDTA chelate to ferric, which oxidizes copper. Although the copper dissolving mechanism of the Citrosolv process is not fully understood, the ferric CA chelate in the Citrosolv process does not oxidize copper.

The prior art Lesinski patent was based on an initial application which taught that ammoniated CA and EDTA were equal in performance in iron mill scale removal at alkaline pH. In prosecution of the patent application, the ammonium salts CA and EDTA were recognized as having "a close chemical relationship to one another" and were said to be "functionally equivalent." In response to rejection on prior art of claims broad enough to encompass citric acid and EDTA, Dow cancelled all references to citric acid in both the claims and specifications of the Lesinski application, except the reference to "CA" in line 62 of col. 2 of the Lesinski patent.

A person skilled in the art knowing of the Lesinski process and the Citrosolv process would know that ammonium EDTA dissolves iron scale at alkaline pH and that an iron-loaded ammonium citrate solution at alkaline pH dissolves copper if an oxidant is added to the solution. The need for an oxidizing agent in removing copper in general would also be apparent to him from a reading of the Alquist patent or the Loucks article. From his general chemical knowledge he would also know that ferric ions oxidize and therefore dissolve copper metal. This fact is likewise disclosed in Dow's prior art Martin et al patent on a HCL process, which also taught that a copper complexor, thiourea, must be present in the solution to maintain copper solubility, i.e., to prevent copper from replating.

The teachings of the Russian article with regard to copper removal with ammoniated EDTA are no more enlightening than its teachings concerning dissolution of iron oxide scale with ammoniated EDTA at alkaline pH, discussed earlier. The article specifically contemplated only simultaneous removal of iron oxide and copper in boiler scale by solution of sodium EDTA or ammoniated CA, at unspecified pH, with an added oxidizer where copper deposits in excess of 15–20% were present in scale.

Upon superficial analysis, the Harriman process appears to amount to nothing more than the substitution of a known ammoniated chelant, ammonium EDTA, for another known chelant, ammoniated citric acid, in what is otherwise the copper stage of the prior art Citrosolv process. Indeed, two of the three named inventors of the Harriman process recognized that a patent would be difficult to obtain in view of the teachings of the Citrosolv process.

The Citrosolv process, however, proceeds through a different mechanism than the Harriman process, and the Citrosolv process is not reliable for removal of heavy deposits of copper. Dow's expert, Frenier, compared the ability of the iron chelate of ammoniated CA and ammoniated EDTA to dissolve copper at an alkaline pH, and proved that the iron chelate of EDTA is from 8 to 15 times more effective than the iron chelate of citric acid whether air alone, sodium nitrite alone, or the combination of air and sodium nitrite is employed as the oxiding agent, or where the ferric chelate is employed by itself. The only time that ammonium citrate was found to be more efficient than ammoniated EDTA in removing or dissolving copper was when no iron chelate was present in the cleaning solution. By this data, Frenier established that copper is dissolved by citric acid in a substantially different way than with ammonium EDTA, i.e., because the ferric citrate does not dissolve copper. In the case of EDTA, very clearly the solution of the copper occurs through the ferric chelate. Taking into consideration the difference in the molecular structure of CA and EDTA, and the unpredictability of the behavior of chelating agents, the foregoing experience and results further support the non-analogous nature of copper removal in the Citrosolv and Harriman processes.

D. Prosecution History of the Harriman '811 Patent

The original application for the Harriman patent was filed on August 1, 1964; this application was abandoned prior to any official action being taken by the Patent Office. A continuation-in-part application was filed October 18, 1965. The original application disclosed both copper removal and a method of achieving passivation.

When the CIP application was filed, the subject matter relating to the passivation method was omitted, and the claimed invention was limited to the copper removal method. In the parent application, Dow cited the Alquist and Alfano Citrosolv patents as the most pertinent art known at that time.

The claims as filed in the CIP were found allowable in the first Official Action and three patents, including the Martin et al and Lesinski patents, were cited to show the present state of the art. The Patent Office file record indicates that twelve subclasses of patents had been searched by the Examiner.

### E. Prosecution History of the Harriman Reissue Patent

On September 14, 1978, Dow filed for reissue of its Harriman '811 patent for the purpose of having the Patent Office re-examine the claims in view of prior art which was not previously considered. Dow called to the attention of the Patent Office all of the art which had been cited in the parent and continuation-in-part applications which resulted in the issuance of the '811 patent, and all the art set forth in Halliburton's Answers to Dow's First Set of Interrogatories, which consisted of thirty-two patents which had not been previously noted as having been considered by the Patent Office. In addition, Dow brought to the attention of the Patent Office that prior art which it considered most relevant to the claimed invention. This most relevant art included that noted in the Patent Office file of the parent and CIP applications of the '811 patent, five additional references cited in Halliburton's Answers to Dow's Interrogatories, and eleven other patents and references which Dow considered relevant.

Dow also furnished the Patent Office with a copy of Halliburton's answer to complaint and counterclaim, and the three legal opinions generated by or for Halliburton relating to the validity and enforceability of the '811 patent. All the patents relied on in these opinions were before the Patent Office in the reissue application.

Patent Examiner Caroff testified that he gave consideration to each of the patents and publications called to his attention by Dow in the prior art statement filed in the reissue proceeding. In the first office action, Examiner Caroff rejected claims 1–5 and 7–8 as anticipated by prior art. He did not reject claim 6 on prior art, but objected to claim 6 as it was dependent from a rejected claim, namely, claims 3, 2, and 1, which claims were rejected as broad enough to include citric acid chelating agents. For this rejection, Examiner Caroff relied on the Alfano patent and the 1961 Alfano and Bell publication. In the rejection, Examiner Caroff noted that the expression "polycarboxylic acid" is sufficiently broad to include citric acid, which is disclosed in the Alfano patent and the publication.

The rejection on Alfano and the Alfano and Bell publication was discussed between Dow Attorney Kanuch and Examiner Caroff on the occasion of the interview on April 19, 1979, the scope of which is set forth in the Examiner Interview Summary Record by Examiner Caroff and Kanuch's Record of Interview.

Caroff testified that he showed his summary to Mr. Kanuch at the conclusion of the interview. It shows that the subjects discussed were claims 1–9. It further indicates that the claims were to be limited to a solution containing amounts of ferric chelate sufficient to dissolve copper, and that the claims were to be limited to the specific chelating agents disclosed in the '811 patent, col. 2, lines 5–10.

Pursuant to the interview, Dow amended claim 1 to replace the expression "polycarboxylic acid" with the expression "alkylene polyamine polyacetic acid," as disclosed in the '811 patent at col. 2, lines 1–11. In the remarks, Attorney Kanuch explained that the term "alkylene polyamine polyacetic acid" had been inserted into the claim and would be referred to as EDTA. This expression excludes citric acid from its cover-

age and this change applies as well to claim 6, because it is dependent on claim 1.

The basis for Examiner Caroff's rejection of claims 1–5 on the Alfano and Bell publication was that the publication shows the removal of copper from a ferrous metal surface using an ammonium ferric citrate solution at an alkaline pH; the publication postulates an ammonium ferric citrate chelate by which the copper is dissolved.

In response to the Examiner's position, Dow distinguished Alfano and the 1961 publication by pointing out that they teach the removal of iron oxide under acidic conditions as contrasted with the claimed ammoniated EDTA solution having the capability of removing iron oxide at alkaline pH of 8–11. Dow further pointed out that ammoniated CA is incapable of removing calcium containing scale, i.e., hardness scale, in contrast to the claimed ammoniated EDTA solution. Dow also argued that neither Alfano nor the 1961 publication teach that a certain level of spentness should be maintained, and that none of the references taught that the ferric chelate of EDTA would be useful for removing copper from ferrous metal surfaces.

On March 26, 1980, Examiner Caroff allowed all of the claims over all of the art of record. These references included the Bell patent, the Russian publication, and the publication by Loucks.

On November 29, 1979, Assistant Commissioner Tegtmeyer directed that the examiner consider and make findings as to the materiality *vel non* of Bersworth patent 3,033,214 with regard to the Harriman patent for use by the Assistant Commissioner in his evaluation of Halliburton's allegations of fraud in the Patent Office by Dow and violation of the duty of disclosure by Dow in prosecution of the Harriman patent. Examiner Caroff reported:

Pursuant to the decision dated November 29, 1979 (paper number 22), a discussion of the Bersworth patent (3,033,214) follows. Bersworth discloses a method of regenerating amino carboxylic acid chelating agents which have become saturated with metals. Bersworth is pertinent to the claimed invention in that ethylenediaminetetraacetic acid (EDTA) is disclosed as one of the chelating agents susceptible to the regeneration process. Copper is mentioned as one of a variety of metals which can be removed from a chelate structure. Bersworth further indicates that the regeneration process can be combined with a cleaning operation to remove scale from heat transfer surfaces. However, the instant claims distinguish over the Bersworth patent in calling for the removal of copper from a ferrous metal surface by contacting the surface with a solution containing the *iron chelates* of EDTA or other alkylene polyamine polyacetic acids. Bersworth does not specify that the alkylene polyamine polyacetic acid chelating agents in particular are to be used when copper is a scale component, let alone the use of the iron chelates of these agents. In this respect the Bersworth patent is no more pertinent to the claimed invention than is the prior art (Alfano) used in rejecting the claims. Moreover, Bersworth is not the only prior art reference recognizing that alkaline solutions of alkylene polyamine polyacetic acid chelating agents can be used to remove scale from heat transfer surfaces—Lesinski also teaches this concept. Therefore, the Bersworth patent is, in essence, merely cumulative in nature. Considering the fact that prior art (Lesinski) was cited during prosecution of parent Serial Number 497,530 which essentially discloses information which parallels the relevant information contained in the Bersworth patent and that the claims were deemed patentable thereover, and further considering the distinctions between Bersworth and the instant claims, it is concluded that the Bersworth patent would not have been important in deciding whether to allow the application to issue as a patent ... (emphasis in original)

Upon consideration of the examiner's findings, Assistant Commissioner Tegtmeyer found that the examiner's conclusions were not unreasonable, and that since

the Bersworth patent was not material to the examination of the patent now sought to be reissued, there [was] no duty to disclose the Bersworth patent to the Office under 37 CFR 1.56(a). [U]nder 37 CFR 1.56(b) "an attorney or agent or inventor has no duty to transmit information (to the Office) which is *not material* to the examination of the application." (emphasis in original).

1.  The April 18, 1979, Interview Between Dow's Attorney Kanuch and Patent Examiner Caroff in the '811 Patent Reissue Application

At trial, Halliburton placed great emphasis on some informal notes dated April 18, 1979, personally found in the reissue application file of the '811 patent by Halliburton's counsel, Cockfield, on April 30, 1980. The notes are Caroff's personal notes prepared after the interview on April 18, 1979, with Kanuch. The notes were not part of the official file.

In the notes, Caroff indicated that the claims (after amendment to exclude CA) were allowable provided on reconsideration the answers to the following questions proved negative:

1.  Did prior art ever contemplate use of EDTA derivative to remove copper metal deposits, or
2.  Did prior art ever *link* EDTA and citric acid as alternative chelating agents for purposes of scale removal? (emphasis in original)

Examiner Caroff showed Kanuch the Examiner Interview Summary Record that he prepared after the aforesaid interview, but he does not remember whether he showed Kanuch his personal notes at any time. After Kanuch filed his summary of the interview and after Caroff considered that response, he did discuss with Kanuch the subject matter of the questions on his notes. Caroff found nothing to criticize in Kanuch's summary of the subject matter discussed at the interview.

Examiner Caroff personally reconsidered the questions in paragraphs 1 and 2 of his notes, and gave consideration to all of the prior art cited by Dow, as shown by his initials opposite the listings, before he allowed the claims.

Halliburton maintains that the Russian article compels an affirmative answer to question 1, and that the Russian article, the Lesinski patent and file history, and the Lesinski article compel an affirmative answer to question 2. Initially, however, it must be recognized that it is unknown exactly what Caroff's notes meant to him. Secondly, the Russian article "teachings" concerning copper removal with EDTA solution discussed above, clearly do not encompass copper removal through the mechanism of oxidation by an "EDTA derivative" such as the ferric chelate of EDTA. Finally, Caroff obviously had more in mind in his second question than the fact, already known to him at the time he wrote the notes, that both CA and EDTA had been widely used in cleaning boiler scale; by "alternative," he may well have meant interchangeable for all purposes, which the two chelants are not.

F.  Halliburton's Noninfringement Allegations of Claim 6 of the '811 Patent Based on Sodium Nitrite

The '811 patent discloses as oxidizing agents air and sodium nitrite, among others. The examples in the patent show that the air is added continuously throughout the copper removal. Claim 6, which Halliburton is accused of infringing, does not call for any particular oxidizing agent but merely for the presence of the ferric chelate in sufficient amount to dissolve the copper.

In Dow's Vertan 675 ACR process, air alone is used to oxidize the ferrous chelate to the ferric chelate, and in the Halliburton MACOR process, air and sodium nitrite are recommended for use and are used for that same purpose. Aside from this difference, the commercial procedures of Dow and Halliburton are sufficiently identical so that they can be and have been interchangeably.

When using air alone as an oxidant, it is possible inadvertently to create a corrosive condition in the boiler. At certain insufficient rates of air injection, the ferric ion concentration is such that boiler metal will not passivate, but is being dissolved. This results in a boiler corrosion and no copper removal. Purportedly to avoid this condition, Halliburton adds sodium nitrite. This, in combination with the air blow, rapidly passes the solution beyond this corrosive stage, induces rapid passivation of the boiler surface, and allows copper ions to remain in solution.

A MACOR Technical Data Sheet, however, indicates that the time required to pass through the "danger area" of between −400 and −650 MV, as defined by Halliburton's Frost, is approximately the same for either air or air plus nitrite, but that air alone takes approximately thirty minutes longer than air plus nitrite to enter the "danger area."

Dow's expert witness, Wayne Frenier, conducted tests to compare air with air and nitrite as the oxidant in the copper removal step of the Harriman patent to form ferric chelate. These test results demonstrate that there is no difference between using air or air and nitrite as the oxidant; both types of oxidants produce the ferric chelate which removes the copper and passivates the steel surface. The same principle is involved whether air or air and nitrite are used in the copper scale removal step, and the only effect that the addition of nitrite has on passivation is to generate more ferric chelate and thereby accomplish oxidation faster than air alone.

An August 15, 1975, report of testing by Halliburton's experts, Bradley and Frost, confirms that there is no difference in either passivation or copper removal whether air alone or a combination of air and nitrite is used to oxidize the iron chelate solution. In these tests, iron oxide was dissolved in the presence of a metal surface containing copper plate, and air alone or air and nitrite were added to the system to dissolve the copper. Essentially identical results were obtained with respect to copper removal and corrosion, regardless of whether air alone or air and nitrite was employed to oxidize the ferrous chelate, which had been formed by the dissolution of iron oxide, to the ferric chelate.

Other tests were conducted for this litigation by Halliburton's expert, Bradley, the results of which were reported in November 1979. Substantial disparities, however, exist between conditions and materials present in commercial boiler cleaning and the conditions selected and used in these tests. The iron chelate was formed not from a metal oxide, but from iron sulfate. Furthermore, the tests were not representative of Halliburton's MACOR procedure in that there was more than 1% of free EDTA in the solution employed and less than 0.15% of iron. Also, the degree of spentness involved in the tests conducted by Halliburton's experts was below that specified in the Harriman patent, viz., 33% vs. the required 60–100%. Additionally, no attempt was made to monitor the pH, even though it was known that the pH would drop if not maintained by the addition of ammonium hydroxide. These significant variances from representative conditions also are present in other testing by Halliburton's Rice.

These conditions selected by Halliburton adversely affect the ability of the system to become passivated when air alone is used. In tests involving passivation, one skilled in the art would know better than to use sulfate as the iron source because a sulfate is a depassivator of steel. The adverse results obtained using iron sulfate can be aggravated by permitting the pH to drift below 9 because such drift produces unstable passivation and corrosion. Also, in laboratory tests where air is blown into the cleaning solution, the pH drops from loss of ammonia, and tests of this type in which the pH is not monitored are unreliable.

Because of the unreliable and unrealistic conditions employed by Halliburton in its work attempting to demonstrate a difference between the use of air alone as compared to the use of air and sodium nitrite,

such work is not proof and cannot be considered as probative as the earlier work conducted by Halliburton which came to the opposite conclusion. The work conducted by Dow's expert Frenier using carefully controlled, representative conditions demonstrates that there is no meaningful difference between the use of air and nitrite as compared to air alone in achieving passivation and removing copper scale.

## VII. THE '160 TEUMAC PATENT

### A. Background

As explained above, in the copper removal process of claim 6 of the '811 Harriman patent, an alkaline solution containing a ferric EDTA chelate is employed to dissolve the copper. To replenish the ferric chelate, which is used up in the dissolution of the copper scale, an oxidizing agent is continuously added throughout the copper removal step. In June 1965, Teumac disclosed a claimed discovery that when the measured oxidation potential of the ammoniated EDTA solution in the copper stage reached a steady state in the range of about –250 to –175 millivolts (mv.), the iron surfaces of the boiler tubes would be passivated and the copper would be dissolved.

The invention of claims 4 and 10 of the '160 Teumac patent is monitoring the oxidation potential of the ferrous-ferric EDTA chelate cleaning solution during the addition of an oxidizing agent and stopping the addition of the oxidizing agent within a certain potential range to thereby insure that the cleaned surface inside the boiler is passivated and that the copper is dissolved.

At the time of Teumac's disclosure, completion of the copper stage was determined by copper titration, or analysis of the EDTA solution, to determine that additional copper was no longer being dissolved. According to Teumac's disclosure, his invention eliminated the need for such conventional copper content analysis. The patent also teaches that addition of too much oxidant causing "overshooting" of the potential range claimed to assure passivation will result in reactivation of the boiler iron.

The practice of the '160 monitoring method involves the continuous and repetitive measurement of the oxidation potential of a sample of the dissolving solution as air is blown into the solution, and continuing the addition of the oxidizing agent until the measured potential becomes stable in the range of about –250 to –175 millivolts. The electrode system employed to measure the oxidation potential may be a standard calomel electrode, and either a platinum or a ferrous metal electrode, which are inserted into a sample of the cleaning solution.

The specification teaches the use of air as the most conveniently used oxidizing agent, but also names oxygen and sodium nitrite and others; the examples report the effect of air and the usefulness of sodium nitrite.

### B. The Scope and Content of the Prior Art

Prior to the Teumac invention, it was known that at a given pH the oxidation potential of a solution in contact with a ferrous metal surface has a direct relationship to the state of passivation of that surface. In his patent disclosure, Teumac admitted that "the literature shows a direct relationship between a noble potential in an electrolyte and resistance to corrosion," citing H.H. Uhlig, *Corrosion Handbook*, page 21. Teumac, however, distinguished the teachings of the Uhlig reference from his invention in that Uhlig taught that the less negative the measured potential of the solution, the greater the passivity of the metal, while Teumac's discovery was that the metal was reactivated after a certain point.

A prior art 1962 Dow publication expressly taught that the relationship between oxidation potential and passivation held true in iron loaded EDTA solutions, as follows:

> Passivation is, in great part, ascribed to the relative potential of the metal with reference to a calomel electrode at a pH of 9, as contrasted to the more negative potential in inhibited acid solutions.

The general relationship between passivation and oxidation potential had been specifically taught by Pourbaix as long ago as World War II. Pourbaix diagrams are calculated diagrams which correlate potential measurements and passivation under certain assumed conditions. The Pourbaix diagram predicts a region of oxidation potential in which metal will passivate, and is a general guide. The diagrams, to an extent, have been verified through actual experience.

When a metal chelate complex is present in the solutions, the nature of the Pourbaix diagram is changed. Whereas the Pourbaix diagram in the 1949 publication related to four to five species, a Pourbaix diagram for ammoniated EDTA involves a multitude of species. In 1977 a Pourbaix diagram for ammoniated EDTA was first calculated with the aid of a computer program.

What was taught prior to Teumac's claimed invention was that an iron surface in contact with ferrous and ferric ions in solution at alkaline pH would be passive if the oxidation potential were greater than (less negative than) a certain reading whose precise value depended on pH. Prior to Teumac, however, no monitoring of oxidation potential to determine passivation was applied to any industrial cleaning solution that contained a chelating agent.

The differences between the subject matter of claims 4 and 10 and the Uhlig handbook, and the Pourbaix diagrams, as a general suggestion of correlation between corrosion and oxidation potentials of solutions in contact with ferrous surfaces is that claims 4 and 10 do not broadly claim the general relationship between oxidation potential and corrosion. Claims 4 and 10 are limited to the specific circumstances of oxidation potential which correlate copper removal and passivation of clean ferrous surfaces in an ammoniated EDTA solution, partially spent, and containing a mixture of ferrous and ferric EDTA chelates. None of the prior art dealt with such solutions. Also, not one of the references taught, or suggested, that at certain mv.

values of solutions containing ferrous-ferric EDTA chelates, one would know that copper had been removed from the ferrous surface sas a function of value of the measured mv.

The Japanese counterpart of the Teumac patent application, at least as to the passivation claim, was rejected on prior art grounds based on publications predating Teumac's claimed invention.

C. Claims 4 and 10 of the '160 Teumac Patent

Claim 4 covers the use of the described monitoring system for passivation purposes, and claim 10 covers the use of the monitoring system for both passivation and copper removal. These claims read as follows:

CLAIM 4

(1) In the method of passivating a ferrous metal surface

(2) in contact with an aqueous solution exhibiting an alkaline pH

(3) and containing both ferric and ferrous ion species

(4) in which additions of oxidizing agent are made to the said aqueous solution the improvement which comprises:

(5) monitoring the state of oxidation exhibited by the ferric iron concentration-ferrous iron concentration ratio during the addition of oxidizing agent and

(6) stopping such addition when the oxidation potential of the said aqueous solution is in the range of 250 to 175 millivolts as measured with a ferrous metal electrode with reference to a saturated calomel electrode

(7) in which the said aqueous solution is maintained at a temperature less than about 180°F and

(8) the said solution contains from 0.5 to about 40 percent by weight of ammoniated EDTA

said ammoniated EDTA having dissolved iron bound thereto to the extent

of 60 to 97 percent of its maximum theoretical chelating capacity.

## CLAIM 10

(1) In the method of removing metallic copper from a ferrous metal surface, and thereafter passivating the ferrous metal surface

(2) in which method copper removal is effected by oxidation of the metallic copper by means of addition of an oxidizing agent,

the improvement which compromises:

(3) monitoring the ratio of ferric ion to ferrous ion species in the solution,

(4) stopping the addition of oxidizing agent when the oxidation potential of the solution is in the range of about 250 to 175 millivolts as measured with a ferrous metal electrode with reference to a saturated calomel electrode.

Claims 4 and 10 refer to an "oxidizing agent," which includes air, or sodium nitrite, or any other oxidant which one skilled in the art would expect to be useful in view of the many enumerated in the specification.

### D. Prosecution History

The '160 patent issued from a patent application filed October 24, 1965. The application was allowed in the first Official Action of the Patent Office. Three U.S. patents were cited by the Patent Office, 3,095,121, 3,214,301 and 3,248,269. The '160 patent was issued on November 26, 1968. None of the prior art cited by Teumac in his patent disclosure, viz., the Uhlig publication, the Citrosolv patent, and the Harriman patent, was cited by Dow in the patent application, nor was the 1962 Dow publication.

### E. Relation of the Teumac Patent to Dow's Vertan ACR Process

Dow ignores the teachings of the Teumac patent in its Vertan ACR process. Field procedures indicate that:

To determine the end of the copper stage, examine copper leveling, EMF, and VERTAN 675 concentration. The approximate end point for EMF is –200 MV, HOWEVER, COPPER MUST ALSO BE LEVELED. When EMF reaches –200MV, shut off air but continue to monitor copper and EMF. If EMF begins to go more negative, or copper is continuing to increase again, start your blow until the copper and EMF leveling criteria is met. Maintain a 1% VERTAN during this period. *ABOVE ALL, COPPER MUST BE LEVEL WITH 1% OR MORE AVAILABLE VERTAN 675 CONCENTRATION, AND THE EMF STABLE FOR AT LEAST 5 MINUTES.*

The logs of operation of Dow jobs indicate quite clearly that the EMF readings are ignored. Such logs, for example, state "do not rely on EMF to end air blow."

The reason why Dow does not follow the Teumac technique is clear from the statements of Mr. Frenier, Dow's boiler cleaning expert. In a June 27, 1977, memo, "Process Controls for ACR Copper Stage," he explains:

A major misunderstanding concerns the use of solution E.M.F. in determining the end-point of the airblow stage, and the bad effects of exceeding the E.M.F. "end-point."

The end of the copper stage is reached only when the copper concentration has leveled for *at least* one-half hour and a 1% residual V675 concentration is present. The solution E.M.F. has little to do with the end of the copper stage. If the solution E.M.F. is so useless for determining copper stage completion, why do we continue to employ the technique? Used correctly, the solution E.M.F. helps the service engineer to accurately follow the course of the copper removal stage.

. . . .

... Therefore, the E.M.F. may change rapidly initially when Fe concontration [sic] is low, "hang-up" for a while before copper starts to come into solution, then "over shoot" the mythical –200MV end point even though copper is still being dissolved.

... If it is desired, the air rate can be reduced, but there will be no bad effects of air blowing to values more positive than –200MV. I have been boilers blown to positive E.M.F. values without adverse effects. There is no scientific basis for a belief that low E.M.F. values cause loss of passivation.

As indicated above, the lower limit of the Teumac range (–250 to –175mv.) has no real meaning. Neither does the upper limit in the range. For example, a 1972 Dow study states "[w]ith values more noble than about –0.550 MV, Cu will not plate and the iron is passive."

### F. Halliburton's Use of Potential Readings in the MACOR Process

In the MACOR process, Halliburton does not terminate air blow in response to any particular oxidation potential reading. Rather, the end of the copper stage is signaled by at least three successive analyses for copper that have been constant within experimental error.

In the MACOR process, oxidation potential, or EMF, is monitored so that the process operator can keep tabs of what is occurring in the boiler. It is important to get over the Flade peak, the "danger area" of ferric ion corrosion of –650 to –400mv., and into the area where the steel surface will be passivated and copper picked up, as quickly as possible. However, in the MACOR process, there is absolutely no danger of "reactivation," as the evidence establishes is the case in the Vertan process. Oxidation potential measurement aid in monitoring what is occurring in the boiler and for that reason are usually recorded.

There is no evidence in the record that Halliburton stops addition of its oxidant in response to any particular EMF reading. Halliburton's procedure is that which Teumac admitted was the prior art, viz., terminating air blow only when copper concentration becomes level.

In some instances, the oxidation potential reading at the conclusion of the copper stage of a MACOR job happens to be within the range claimed by Teumac. Hallibur-

ton has no control over this physical fact. Halliburton does not take affirmative action in response to the monitored oxidation potential within Teumac's claimed range.

### VIII. THE ACCUSED PRACTICES

#### A. Halliburton's Practice at Metropolitan in Edison's Titus Station No. 1

In the cleaning of Metropolitan Edison's Titus Station No. 1 boiler near Reading, Pennsylvania, in October 1977, Halliburton employed ammoniated EDTA as the cleaning agent following the MACOR procedure. In that cleaning, Halliburton removed approximately 3500 pounds of iron oxide and 850 pounds of copper using the MACOR process. The iron oxide was dissolved using an ammoniated EDTA solution having a pH of 9–10.

In cleaning the boiler of Metropolitan Edison, Halliburton practiced every phrase of claim 6 of the Lesinski '065 patent and cleaned the boiler in essentially the same way as Dow had earlier done using its ammoniated EDTA ACR process.

Upon completing the solution of the iron oxide scale with the ammoniated EDTA solution, Halliburton cooled the boiler from a temperature of 230–300°F employed during the iron oxide solution down to 150°F for copper removal, added an oxiding agent to oxidize the ferrous EDTA to the ferric EDTA, and thereby removed the copper scale. After the initial addition of the oxidizing agent, sodium nitrite and air, the degree of spentness of the solution was 70%. The addition of air was continued throughout the copper removal stage.

Every phrase of claim 6 of the Harriman '811 patent was practiced by Halliburton in removing copper scale using ammoniated EDTA in the cleaning operation at Metropolitan Edison's Titus No. 1 boiler.

During the copper removal stage, Halliburton monitored the oxidation potential throughout the air injection. The potential was about –190 millivolts when air blow was terminated, at which point the steel

was passivated and 850 pounds of copper had been removed.

Every phrase of claim 4 of the '160 Teumac patent is met by the monitoring procedure employed by Halliburton for achieving passivation, as is every phrase of claim 10 on copper removal.

The MACOR procedure employed by Halliburton for the cleaning of a boiler at Metropolitan Edison's Titus Station is essentially the same procedure as that which was developed for a sister boiler at that station in 1975 by Dow using Vertan 675 ammoniated EDTA, except that Halliburton employed sodium nitrite in addition to air.

### B. Halliburton's Practice at MP&L's Delta No. 1 Boiler

The MACOR process as practiced by Halliburton in the cleaning of Delta No. 1 boiler of Mississippi Power & Light in Cleveland, Mississippi, in February 1978 made use of an ammoniated EDTA solution at a pH of about 9 to successfully dissolve 724 pounds of iron oxide scales from the metal surface in that boiler, and the steps performed correspond literally to the words of claim 6 of the Lesinski '065 patent.

Upon the completion of the iron oxide stage, Halliburton cooled the solution containing the ferrous iron chelate, and oxidized it to contain the ferric chelate by using air and sodium nitrite. At the beginning of the copper removal stage, the cleaning solution contained .55% of free EDTA, and the solution had a degree of spentness of 74%. Air was added constantly during the copper stage to replenish any depleting ferric chelate. The cleaning procedure employed by Halliburton on Delta No. 1 for copper removal resulted in the removal of 144 pounds of copper. The procedure followed by Halliburton in removing copper scale corresponds literally to the phrases of claim 6 of the '811 patent.

### C. Halliburton's Practice at MP & L's Delta No. 2 Boiler

The MACOR process as practiced by defendant Halliburton in the cleaning of Delta No. 2 boiler, Mississippi Power and Light in Cleveland, Mississippi, in March of 1978 made use of an alkaline ammoniated EDTA solution at a pH of about 9 to successfully dissolve 426 pounds of iron oxide from the metal surfaces in that boiler, and corresponds literally to every phrase of claim 6 of the '065 patent.

Following the iron oxide removal, the cleaning solution was cooled to within a range of 130–177°F, and sodium nitrite and air were added to the cleaning solution, oxidizing the ferrous chelate in the cleaning solution to ferric chelate and causing the dissolution of 54 pounds of copper scale. At the start of the copper removal, the degree of spentness of the solution was about 69%. Consequently, the procedure employed by Halliburton for the removal of copper in the cleaning of Delta No. 2 boiler met every phrase of claim 6 of the Harriman '811 patent.

### CONCLUSIONS OF LAW

### I. GENERAL

### A. Jurisdiction

The court has jurisdiction of these actions under 28 U.S.C. §§ 1338(a), 1400(b), 2201, and 2202 for claims arising under 35 U.S.C. §§ 271, 281, 283, and 284.

### B. Presumption of Validity

■ A patent is presumed to be valid, 35 U.S.C. § 282. "This presumption can be overcome only by clear and convincing evidence, with the burden of persuasion remaining upon the party asserting invalidity." *Astra-Sjuco, A.B. v. United States International Trade Commission*, 629 F.2d 682, 688, 67 C.C.P.A. 128 (1980).

The presumption of validity of reissue patents is "greatly strengthened" when the most pertinent prior art has been considered by the Patent Office, *National Rolled Thread Die Co. v. E.W. Ferry Screw Products, Inc.*, 541 F.2d 593, 597 (6th Cir.1976), and it is reinforced when others have acquiesced in the patents over years of successful commercial use. *Eli*

*Lilly & Co. v. Generix Drug Sales, Inc.,* 460 F.2d 1096, 1101 (5th Cir.1972).

### C. Obviousness

A patent may not be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103. Obviousness is a question of law dependent upon underlying fact findings.

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.

*Graham v. John Deere,* 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

Prior art pertinent to a determination of the issue of obviousness is that art in which is found the problems solved by the invention of the patent at issue, and analogous art. *See Graham,* 383 U.S. at 35, 86 S.Ct. at 702; *John Zink Co. v. National Airoil Burner Co., Inc.,* 613 F.2d 547, 551 (5th Cir.1980). It is improper to extract from any one reference only so much of it as will support a given position, and to exclude other parts necessary to a full appreciation of what the reference fairly suggests as a whole to one of ordinary skill in the art. *Application of Meng,* 492 F.2d 843, 847–48 (C.C.P.A.1974). That the prior art may have individual features of a patented invention does not, without more, invalidate the patent under 35 U.S.C. § 103; the bringing together of such features or steps would have to be obvious to one of ordinary skill in the art. *Webster Loom Co. v. Higgins,* 105 U.S. (15 Otto) 580, 591, 26 L.Ed. 1177 (1882). A patentable invention involves more than "improvement ... [which] is the work of the skillful mechanic not that of the inventor." *Hotchkiss v. Greenwood,* 52 U.S. (11 How.) 248, 267, 13 L.Ed. 683 (1851).

As provided by 35 U.S.C. § 103, the question of obviousness is determined as of the time that the invention in issue was made. "Simplicity and hindsight are not proper criteria for resolving the issue of obviousness," *Stevenson v. International Trade Commission,* 612 F.2d 546, 554, 67 C.C.P.A. 109 (1979), nor is the invention precluded because the solution to a problem may appear simple after the fact, *Goodyear Tire & Rubber Co., Inc. v. Ray-O-Vac Co.,* 321 U.S. 275, 279, 64 S.Ct. 593, 595, 88 L.Ed. 721 (1944).

A patentee may establish a date of invention prior to the date on which his application was filed by evidence of actual reduction to practice of his invention prior to the filing date, and such date, if established, is the "time the invention was made" used in determining obviousness under 35 U.S.C. § 103. *Lockheed Aircraft Corp. v. United States,* 553 F.2d 69, 74, 213 Ct.Cl. 395 (1977). But "the burden of proof of an inventor's alleged conception and reduction to practice is a heavy one requiring full corroboration by other than the inventor's own self-serving testimony or records." *Id.*

There is "no better way to determine whether an invention would have been obvious to persons of ordinary skill in the art at the time than to see what such persons actually did or failed to do when they were confronted with the problem in the course of their work." *Timely Products Corp. v. Arron,* 523 F.2d 288, 294 (2d Cir.1975). An invention is not obvious "[i]f the evidence shows that a number of skilled technicians actually attempted, over a substantial period, to solve the specific problem which the invention overcame and failed to do so, notwithstanding the availability of all the necessary materials...." *Id.*

Other indicia that an invention is not obvious are commercial success of the invention, *Graham,* 383 U.S. at 17, 86 S.Ct. at 694, contemporaneous failure of others to solve the problem solved by the invention, *Continental Oil Co. v. Cole,* 634 F.2d 188, 197 n. 5 (5th Cir.1981), and copying of

the invention, *Antici v. KBH Corporation,* 324 F.Supp. 236, 244 (N.D.Miss.1971). Such "secondary considerations may serve to 'guard against slipping into hindsight' and 'to resist the temptation to read into the prior art the teachings of the invention in issue.'" *Stevenson,* 612 F.2d at 553.

### D. Specification

35 U.S.C. § 112 provides that a patent specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains ... to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

*Id.* This requires an applicant to provide information in his patent specification sufficient to teach a person skilled in the art how to practice the invention without undue experimentation, *Mowry v. Whitney,* 81 U.S. (14 Wall.) 620, 20 L.Ed. 860 (1872); *Application of Hirsch,* 295 F.2d 251, 253–54, 49 C.C.P.A. 745 (1961); and requires the inventor to make a good faith disclosure of what he considers to be the best method of practicing the invention at the time he executes the patent specification, *Studiengesellschaft Kohle v. Eastman Kodak Co.,* 616 F.2d 1315, 1339–40 (5th Cir.1980).

35 U.S.C. § 112 further provides that "[t]he specifications shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

### E. Joint Inventorship

■ A patent is invalid under 35 U.S.C. § 256 if it incorrectly lists persons as joint inventors with deceptive intent to benefit the patent applicant. *Shields v. Halliburton Co.,* 493 F.Supp. 1376, 1386 (W.D.La. 1980). On the other hand,

the contribution among joint inventors does not have to be equal. A person who merely followed the instructions of another in performing experiments is not a joint inventor, but a person who plays at least some role in the final conception of that which is sought to be patented, is a joint inventor.

*Shields,* 493 F.Supp. at 1385.

### F. Duty of Candor and Good Faith

37 C.F.R. § 1.56(a) imposes a "duty of candor and good faith" on applicants for patents and their agents in dealing with the Patent and Trademark Office. This section requires

All such individuals ... to disclose to the Office information they are aware of which is material to the examination of the application. Such information is material when there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent....

37 C.F.R. § 1.56(a). 37 C.F.R. § 1.56(d) further provides that no patent will be issued

if ... it is established by clear and convincing evidence (1) that any fraud was practiced or attempted on the Office in connection with the application, or in connection with any previous application upon which the application relies, or (2) that there was any violation of the duty of disclosure through bad faith or gross negligence in connection with the application, or in connection with any previous application upon which the application relies.

*Id.*

The courts have long recognized such a duty on applicants for patents, and have denied enforcement of patents obtained through inequitable conduct. As stated in *True Temper Corp. v. CF & I Steel Corp.,* 601 F.2d 495 (10th Cir.1979),

It is, of course, well established that the exercise of fraud, inequitable conduct, or bad faith in prosecution of a patent application before the Patent Office may result in unenforceability of the patent ultimately issued. This rule of equity stems from the "paramount interest [of the public] in seeing that patent

monopolies spring from backgrounds free from fraud or other inequitable conduct." Because the Patent Office lacks proper means for fully investigating patent claims, a patent applicant stands before it in a confidential relationship. The system could not function successfully if an applicant were "allowed to approach the Patent Office as an arm's length adversary." Instead, the applicant owes an "absolute duty of full and complete disclosure of all matters reflecting adversely upon his patent," and he risks non-enforcement of his monopoly on later discovery of a failure to fulfill that obligation.

*Id.* at 501 [citations omitted].

■ The duty of good faith obviously applies to affidavits submitted in patent applications, since the Patent Office has no means to verify the data reported in such affidavits. Numerous patents have been held unenforceable when affidavits submitted by an applicant failed to disclose the applicant's own unfavorable research test data, *e.g., Eltra Corp. v. Basic, Inc.,* 599 F.2d 745, 754–56 (6th Cir.1979); *In re Multidistrict Litigation Involving Frost Patent,* 540 F.2d 601, 607–08 (3d Cir.1976); *Monsanto Co. v. Rohm & Haas Co.,* 312 F.Supp. 778, 791 (E.D.Pa.1970), *aff'd,* 456 F.2d 592 (3d Cir.1972); or provided misleading information as to test conditions, *e.g., True Temper Corp., supra;* or contained statements known by the applicant to be false, *e.g., Monolith Portland Midwest Co. v. Kaiser Aluminum and Chemical Corp.,* 407 F.2d 288, 294 (9th Cir.1969).

■ As explained by ex-Patent Commissioner Dann, an applicant's duty of candor is satisfied where his attorney exercises a good faith judgment as to the "materiality" of the prior art or other information in question. As further explained by Dann, an applicant has no duty to disclose conflicting test data prepared by one contesting the patent, with which data the applicant takes issue, since the Patent Office has no laboratory or technical assistance means to evaluate such conflicts, nor does an applicant have any duty to call to the attention of the Patent Office good faith differences of opinion between the applicant and the other as to the technical or legal correctness of interpretations of matters bearing upon the application.

### G. Infringement

■ There are two techniques to be employed in considering the issue of infringement, viz., literal infringement, or infringement under the doctrine of equivalents. *Eastman Kodak Co.,* 616 F.2d at 1324.

"In considering literal infringement, the patent's claims must be read in connection with the patent's specification and its file history, and the claims of patent cannot be given a construction broader than the teachings expressed in the patent." *Id.*

"In determining whether an accused [process] infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it." *Graver Tank & Manufacturing Co., Inc. v. Linde Air Products Co.,* 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950).

Since literal infringement may be avoided by minor modifications in a patented invention, "courts have developed the doctrine of equivalents to protect patentees from inventions that perform substantially the same function substantially the same way to obtain substantially the same result." *Eastman Kodak Co.,* 616 F.2d at 1324. Under the doctrine of equivalents, "[w]hat constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case." *Graver Tank & Manufacturing Co., Inc.,* 339 U.S. at 609, 70 S.Ct. at 856.

"In examining the context of the patent itself, the patent claims must be construed in the light of the description and the real invention disclosed in the patent's specification and examples." *Eastman Kodak Co.,* 616 F.2d at 1324.

■ In determining whether a patent has been infringed, the court must con-

strue the patent as a matter of law, but factual findings may be employed in arriving at the patent's proper construction. *Id.* at 1323–24.

## II. THE LESINSKI '065 PATENT

▆ July 23, 1962, the date of filing of his original application, is the record date of invention to which Lesinski is entitled for the subject matter of claim 6 of the '065 patent.

▆ The Lesinski patent is not invalid under 35 U.S.C. § 103 for obviousness since one of ordinary skill in the art of chemical cleaning at the time of the invention would not have had reason to believe that an ammoniated EDTA solution at alkaline pH would effectively dissolve iron oxide scale from a metal surface without an added reducing agent. Support for this conclusion is found in the commercial success of Dow's Vertan process, Halliburton's lack of success in developing a similar process with the Dequest chemicals, Halliburton's acquiescence in the patents over many years of successful commercial use by Dow, and Halliburton's copying of the Vertan process. The Lesinski patent, however, does not disclose an invention enjoying pioneer status, since the art of chemical cleaning using chelants was old at the time of the invention.

▆ We also hold that the Lesinski patent is not invalid for failure to comply with 35 U.S.C. § 113 because of failing to disclose Dow Vertan field procedures and inhibitor formulations in the Lesinski application.

The court is unpersuaded by Halliburton's contention that the Lesinski patent is invalid for failure to point out and distinctly claim the subject matter of the invention with regard to pH and reducing agent, and the patent is invalid under 35 U.S.C. § 112. These arguments are clearly without merit.

▆ Dow did not breach its duty of good faith toward the Patent Office in prosecution of the Lesinski reissue application. The Lesinski affidavit is found to be truthful. As noted earlier, the examiner had considered all art cited in the June 26, 1980, letter of Halliburton's counsel, and the remainder of the letter concerning invalidity and unenforceability "defenses" were simply Halliburton's "arguments and interpretations." There were no misrepresentations with regard to pH of the Lesinski test or the necessity of a reducing agent.

▆ Only these tests performed under the same conditions as the Lesinski examples are valid comparisons. The purpose of the Lesinski examples is to demonstrate the difference in reactivity between sodium EDTA and ammonium EDTA, and even the Halliburton test results demonstrate significantly better reactivity of ammonium EDTA over sodium EDTA. Since all the test results in evidence show significantly better dissolution with ammonium EDTA than with sodium EDTA, and since many of those test results were not conducted under the conditions of the Lesinski examples, the court is unable to conclude that Dow should be denied enforcement of its patents because of failure to submit such test results.

▆ The use by Halliburton of its MACOR process for removing iron oxide scales from ferrous metal surfaces by utilizing the procedures published in its technical data sheet and described in its field bulletins is a literal infringement of claim 6 of the Lesinski '065 patent and U.S. Reissue Patent 30,796.

Halliburton's use of the MACOR process in the cleaning of Metropolitan Edison Titus Station No. 1 in October 1977, in the cleaning of MP & L's Delta Boiler No. 1 in February 1978, and in the cleaning of MP & L's Delta Boiler No. 2 in March 1978 are infringements of claim 6 of the Lesinski '065 patent and U.S. Reissue Patent 30,796.

## III. HARRIMAN '811 PATENT

▆ We hold that the Harriman patent is not invalid for obviousness since one of ordinary skill in the art of chemical cleaning at the time of the invention would not have had reason to believe that the ferric

chelate of EDTA would oxidize and dissolve copper deposits from utility boiler tubes.

■ The patent application properly lists Harriman, Teumac, and Muehlberg as joint inventors since all three played some part in final conception of the process.

■ Dow did not fail to satisfy its duty of candor and good faith in prosecution of the Harriman reissue patent. While Halliburton claims that Dow hid pertinent prior art in its reissue application, the examiner specifically cited the Alfano, Citrosolv and Lesinski patents at certain stages of the reissue proceeding, and Dow made no attempt to hide within the application any other prior art, including the Russian article. *See Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.*, 359 F.Supp. 948, 964–65 (S.D.Fla.1972), *aff'd*, 479 F.2d 1328 (5th Cir. 1973), relied upon by Halliburton, is not factually analogous to the Harriman reissue proceeding.

■ Halliburton's claim of noninfringement of the Harriman patent because of Halliburton's use of both air and sodium nitrite in the copper removal stage of the MACOR process is not well founded.

■ The use by Halliburton of its MACOR process to remove copper from ferrous metal surfaces by utilizing the procedures published in its technical data sheet and described in its field bulletins is a literal infringement of claim 6 of the Harriman patent and claim 10 of U.S. Reissue Patent 30,714. If such use is not a literal infringement, it constitutes an infringement under the doctrine of equivalents.

The use of the MACOR process by Halliburton in the cleaning of Metropolitan Edison's Titus Station No. 1 in October 1977, in the cleaning of MP & L's Delta Boiler No. 1 in February 1978, and in the cleaning of MP & L's Delta Boiler No. 2 in March 1978 are infringements of claim 6 of the Harriman patent and claim 10 of U.S. Reissue Patent 30,714.

## IV. THE TEUMAC '160 PATENT

"[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum of workable ranges by routine experimentation." *Application of Aller*, 220 F.2d 454, 456, 42 C.C.P.A. 824 (1955). "No invention is involved in discovering optimum ranges of a process by routine experimentation." *Id.* at 458. The "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." *Application of Boesch*, 617 F.2d 272, 276 (C.C.P.A.1980).

■ Prior to the Teumac invention, it was known that at a given pH the oxidation potential of a solution in contact with a ferrous metal surface has a direct relationship to the state of passivation of that surface, and such was recognized by Teumac in his patent disclosure. At best, what Teumac did in making the alleged invention of claim 4 was to determine the optimum range to achieve passivation. This approach, even if it had been successful, would not result in a patentable invention.

■ Teumac distinguished the discovery of claim 4 from the prior art by claiming that the ferrous metal would be reactivated after a certain point as the oxidation potential reading became less negative. We have found that this is simply not true.

A patentee may not arbitrarily select a point in a progressive change and maintain a patent monopoly for all operations in that progressive change falling on one particular side of that arbitrarily selected point. It is only where the selected point corresponds with the physical phenomenon and the patentee has discovered the point at which that physical phenomenon occurs that the maintenance of a patent monopoly is admissible.

*Helene Curtis Industries, Inc. v. Sales Affiliates, Inc.*, 233 F.2d 148, 153 (2d Cir. 1956) (quoting *Kwik Set v. Welch Grape Juice Co.*, 86 F.2d 945, 947 (2d Cir.1936)). There is nothing critical about the claimed oxidation potential range of the Teumac patent as it relates to claim 4, the passiva-

tion claim, and the evidence establishes that neither the upper nor the lower limit of the claimed potential range has any real meaning.

The differences between the subject matter claimed by claim 4 of the Teumac patent and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art. Claim 4 of the patent accordingly is invalid under 35 U.S.C. § 103.

■ 35 U.S.C. § 101 requires that an invention must be "useful" to be patentable. Thus, when a patented process proves inoperable or the results purportedly achieved by that process are not in fact achieved, the patent is invalid. *Gross v. General Motors Corp.*, 521 F.2d 45, 49 (1st Cir.1975).

■ The subject matter of claim 10 of the Teumac patent—determining completion of copper removal by monitoring oxidation potential—would not have been obvious at the time of the invention to a person of ordinary skill in the art of chemical cleaning, if the claimed invention in fact worked. However, the alleged invention of claim 10 simply does not work, and is not followed by Dow. Claim 10 of the Teumac patent accordingly is invalid under 35 U.S.C. § 101.

■ Additionally, claim 4 of the Teumac patent is unenforceable because Dow failed to inform the Patent and Trademark Office that it was known, prior to Teumac, to utilize oxidation potential measurements with reference to calomel electrode for the purpose of ascertaining passivation conditions, and also failed to provide the Patent and Trademark Office with the prior art considered by Teumac as being the most pertinent.

At the least, the prior art 1962 Dow publication, the Uhlig Corrosion Handbook, and the fact that the prior art disclosed a direct relationship between oxidation potential and passivation, constitute materials which a reasonable patent examiner would have considered important in deciding whether to allow claim 4 of the Teumac application to issue as a patent. Dow's failure to disclose these materials constitutes deliberate withholding of material directly relevant to patentability of claim 4, and renders that claim of the Teumac patent unenforceable.

If the Teumac patent were valid and enforceable, Halliburton's use of the MACOR process in the cleaning of Metropolitan Edison's Titus Station No. 1 in October 1977 would be an infringement of claims 4 and 10 of the patent.

## V. CONCLUSION

By way of summary, the court HOLDS that claim 6 of the original and reissue Lesinski patent and claim 6 of the Harriman patent, now claim 10 of the Harriman reissue patent, are VALID and have been infringed by Halliburton and MP & L; that claim 4 of the Teumac is INVALID and unenforceable, and claim 10 of the Teumac patent is INVALID.

Let an order issue accordingly in each case directing each of the defendants to make an accounting of the profits derived from the use made of the infringed patents, but in no event, shall defendants be liable for less than a reasonable royalty for the use of Dow's patents together with interest and costs as fixed by the court.

## JUDGMENT (GC 78–31–WK–P)

After due consideration of the evidence presented at trial, the Report and Recommendation of the United States Magistrate, and objections thereto, and for the reasons set forth in Memorandum Opinion this date released, it is ORDERED as follows:

1. That claim 6 of U.S. Patent 3,308,065 (U.S. Reissue Patent 30,796) and claim 6 of U.S. Patent 3,438,811 (claim 10 of U.S. Reissue Patent 30,714) are VALID and ENFORCEABLE, and the counterclaim of Halliburton Company for a declaratory judgment that said claims are invalid and unenforceable is hereby DISMISSED with prejudice;

2. That defendant Halliburton Company infringed claim 6 of U.S. Patent 3,308,065 (U.S. Reissue Patent 30,796) and claim 6 of U.S. Patent 3,438,811 (claim 10 of U.S. Reissue Patent 30,714) by the use of its MACOR process in the cleaning of Metropolitan Edison Titus Station No. 1 in October 1977, in the cleaning of Mississippi Power & Light Company Delta Boiler No. 1 in February 1978, and in the cleaning of Mississippi Power & Light Company Delta Boiler No. 2 in March 1978, and is liable in damages to plaintiff The Dow Chemical Company for said infringement;

3. That claim 4 of U.S. Patent 3,413,160 is INVALID and UNENFORCEABLE, and claim 10 of said patent is INVALID, plaintiff's complaint thereon is DISMISSED with prejudice, and judgment accordingly is hereby entered for defendant on its counterclaim for a declaratory judgment that said claims are invalid and unenforceable.

4. That defendant Halliburton Company shall, within four (4) months from this date or such further time as may be granted by the court, file an accounting of all profits derived by it or any person, firm or corporation under its direction or control from the infringing use of plaintiff's aforesaid patents described in paragraph 1 hereof for a period of six years prior to March 17, 1978, the date on which this cause was filed;

5. That Halliburton Company, its agents, representatives, assigns, and all persons acting in concert therewith be, and they are, hereby PERMANENTLY ENJOINED from infringing upon claim 6 of U.S. Patent 3,308,065 (U.S. Reissue Patent 30,796) and claim 6 of U.S. Patent 3,438,811 (claim 10 of U.S. Reissue Patent 30,714), belonging to The Dow Chemical Company; and

6. The issue of attorneys fees is reserved pending determination of damages recoverable by The Dow Chemical Company.

## JUDGMENT (GC 78–32–WK–P)

After due consideration of the evidence presented at trial, the Report and Recommendation of the United States Magistrate, and objections thereto, and for the reasons set forth in Memorandum Opinion this date released, it is ORDERED as follows:

1. That claim 6 of U.S. Patent 3,308,065 (U.S. Reissue Patent 30,796) and claim 6 of U.S. Patent 3,438,811 (claim 10 of U.S. Reissue Patent 30,714) are VALID and ENFORCEABLE, and the counterclaim of Mississippi Power & Light Company for a declaratory judgment that said claims are invalid and unenforceable is hereby DISMISSED with prejudice;

2. That defendant Mississippi Power & Light Company infringed claim 6 of U.S. Patent 3,308,065 (U.S. Reissue Patent 30,-796) and claim 6 of U.S. Patent 3,438,811 (claim 10 of U.S. Reissue Patent 30,714) in the cleaning of its Delta Boiler No. 1 in February 1978 and in the cleaning of its Delta Boiler No. 2 in March 1978, and is liable in damages to plaintiff The Dow Chemical Company for said infringement;

3. That claim 4 of U.S. Patent 3,413,160 is INVALID and UNENFORCEABLE, and claim 10 of said patent is INVALID plaintiff's complaint thereon is DISMISSED with prejudice, and judgment accordingly is hereby entered for defendants on its counterclaim for a declaratory judgment that said claims are invalid and unenforceable;

4. That defendant Mississippi Power & Light Company shall, within four (4) months from this date or such further time as may be granted by the court, file an accounting of all profits derived by it or any person, firm or corporation under its direction or control from the infringing use of plaintiff's aforesaid patents described in paragraph 1 hereof for a period of six years prior to March 17, 1978, the date on which this cause was filed;

5. That Mississippi Power & Light Company, its agents, representatives, assigns, and all persons acting in concert therewith, be, and they are hereby, PERMANENTLY ENJOINED from infringing upon claim 6 of U.S. Patent 3,308,065 (U.S. reissue Patent 30,796) and claim 6 of U.S. Patent 3,438,811 (claim 10 of U.S. Reissue Patent

30,714), belonging to The Dow Chemical Company; and

6. The issue of attorneys fees is reserved pending determination of damages recoverable by The Dow Chemical Company.